Hillsborough
No. 81-115

Rocco V. Campo & a.

v.

John J. Maloney

March 5, 1982

*O'Neill & Backus,* of Manchester (*Luke S. O'Neill, Jr.,* on the brief and orally), for the plaintiffs.

*Sullivan, Gregg & Horton,* of Nashua (*Sherman D. Horton, Jr.,* on the brief and orally), for the defendant.

Bois, J.  The defendant, John Maloney, appeals from a Superior Court (*Loughlin,* J.) decision approving a Master's (*Walter D. Hinkley,* Esq.) report which recommended a $115,870 verdict for the plaintiffs, Rocco Campo, Vincent Campo, and Joseph Civiello. The verdict, including an award of attorney's fees, resulted from the defendant's liability on three notes which the plaintiffs held as assignees. We affirm.

In 1971, the plaintiffs and two corporations which they controlled, Pilgrim Plaza, Inc., and Greatstone Development Corporation, entered into a purchase-and-sale agreement with a group of individuals consisting of Morris Soifert, John Chesson, Howard Lappe, Roland Levesque and defendant Maloney (buyers). According to the terms of the contract, the plaintiffs and their corporations agreed to sell four parcels of land, known as Londonderry, Laconia, Merrimack and Bedford properties, to the buyers or their nominee for $320,000.

Shortly thereafter, the buyers undertook to form a corporation called Rolling Stones, Inc., which they designated as their nominee in the agreed-upon transaction. In addition, a sixth buyer, William Shooman, subsequently became a party to the transaction. At least five of the individual buyers were stockholders of Rolling Stones, Inc.

On October 27, 1971, the six individual buyers and Rolling Stones, Inc., through its president (Morris Soifert), obtained financing for the transaction by executing three promissory notes.

First, they gave a note for $220,000 to the Merchants Savings Bank of Manchester. This note was secured by mortgages on the four parcels mentioned above, and was signed on behalf of Rolling Stones, Inc., and by all of the individual buyers.

Next, the individual buyers and Rolling Stones, Inc., gave a note for $70,000 to Pilgrim Plaza, Inc. This note was secured by a second mortgage on the Bedford property.

Finally, they gave a note for $30,000, together with a second mortgage on the Londonderry tract, to Greatstone Development Corporation.

The Pilgrim Plaza and Greatstone notes were similar in form; both notes contained an express promise by Rolling Stones, Inc., to pay the respective debts, and both notes were signed on behalf of Rolling Stones, Inc., as well as by the six individual buyers. Under the terms of these notes, the buyers waived their rights with respect to presentment for payment, demand, protest, notice of protest, and notice of dishonor. The buyers further agreed to pay all costs which the lenders might incur in collecting the Pilgrim Plaza and Greatstone loans, including reasonable attorney's fees.

Upon execution of the three notes and the mortgages securing them, the sellers signed warranty deeds conveying the properties to Rolling Stones, Inc. According to testimony at trial, the parties agreed to have the Merchants Savings Bank hold the documents in escrow until they finalized the transactions. Although Rolling Stones, Inc. was not officially incorporated at the time of the execution of the various notes and mortgages, the corporate directors voted unanimously, after the corporation had become a legal entity, to ratify all the purported actions of the corporation relating to these documents.

While the Merchants Savings Bank held the documents in escrow, the individual buyers examined the Bedford property and discovered an alleged acreage deficiency. Angered by the apparent deficiency, the buyers voted to cancel the entire transaction. They failed, however, to communicate their objections to the Merchants Savings Bank prior to the recording of the documents in November 1971, and the deal proceeded as originally planned.

In January 1972, four of the original buyers remained disenchanted with the transaction. As a result, on January 26, 1972, the buyers negotiated a written agreement among themselves, whereby two of the parties (Morris L. Soifert and Howard Lappe) assumed all of the other parties' obligations with respect to the October 27, 1971, transaction. In return, the four exonerated individuals, including the defendant Maloney, agreed to relinquish

their interests in the mortgaged properties and in Rolling Stones, Inc.

On February 3, 1972, the sellers paid Rolling Stones, Inc., then consisting of only two stockholders, $20,000 as a settlement of all claims regarding the acreage deficiency in the Bedford tract.

The three promissory notes went into default status shortly after their execution. The Merchants Savings Bank therefore made an additional agreement with Rolling Stones, Inc. to facilitate payment of the Bank's $220,000 note. Accordingly, between December 1972 and July 1973, the bank released its mortgages on the Laconia, Merrimack and Londonderry tracts, and Rolling Stones, Inc., sold these properties. In consideration for the mortgage releases, Rolling Stones, Inc. applied the proceeds from the sales against the $220,000 note. The consideration for release of the Laconia mortgage exactly equalled the amount of the bank's loan appraisal value for this property, but was some $5,000 less than the previous sale price to Rolling Stones, Inc. The consideration for release of the Merrimack mortgage exceeded the bank's loan appraisal value for this parcel, but was $2,136 less than the original sales price to Rolling Stones, Inc. Finally, the Londonderry parcel was released for an amount exceeding the Rolling Stones, Inc. purchase price, but approximately $37,000 less than the bank's loan appraisal value.

In addition to the mortgage releases given by the Merchants Savings Bank, Greatstone Development Corporation released its second mortgage on the Londonderry tract, apparently without receiving any consideration.

Thus, in July 1973, Rolling Stones, Inc. had reduced its liability for principal and interest on the bank's $220,000 note to approximately $82,000. At the same time, however, the entire amounts of the Pilgrim Plaza and Greatstone notes, plus interest, were outstanding. The mortgage releases left the Bedford property as the only remaining security.

In October 1973, the $220,000 note remained in default and the Merchants Savings Bank started foreclosure proceedings on the Bedford property. One month later, the three notes and the mortgage rights in the Bedford security were assigned to the plaintiffs, who continued the foreclosure proceedings that the bank had originated. The plaintiffs advertised the foreclosure sale in several major newspapers, and at least twelve people, including the defendant, attended the April 15, 1974, sale. Plaintiff Rocco V. Campo outbid another individual and purchased the property for $72,000.

Following the foreclosure sale, a deficiency of approximately

$17,000 existed on the $220,000 note, while the other notes remained outstanding in their entireties. The plaintiffs, as assignees of the three notes, brought suit against the six individual signatories, claiming that the signatories were jointly and severally liable for the outstanding balances.

On March 27, 1975, two of the individual signatories, John Chesson and Roland Levesque, each paid $26,250 to the plaintiffs. In return, the plaintiffs executed written instruments releasing these two individuals from further liability. The written releases specifically reserved the plaintiffs' rights against the four other signatories. The plaintiffs also filed docket markings indicating that they had released Chesson and Levesque.

Following the release of Chesson and Levesque, the plaintiffs obtained summary judgments against Lappe and Soifert, leaving as outstanding only their actions against Maloney and Shooman. While these two actions were still pending, the defendant Maloney brought suit for contribution against the five other individual signatories. On April 28, 1976, the superior court consolidated all the pending actions relating to the October 27, 1971, transaction.

At trial of the plaintiffs' underlying action, the master found Maloney and Shooman liable to the plaintiffs as principal makers on all three notes. With regard to the Pilgrim Plaza and Greatstone notes, the master recommended an award of attorney's fees equivalent to fifteen percent of the balance due on these notes. In Maloney's contribution actions against Soifert and Lappe, the master recommended verdicts for Maloney in the same amount as the amount of the plaintiffs' verdict against him. Pursuant to the defendant Maloney's request, the master recommended that the court hold his contribution actions against Chesson, Levesque, and Shooman in abeyance until final determination of his liability. The trial court approved the master's report and denied Maloney's motion to set aside the plaintiffs' verdict against him. The defendant Maloney appealed to this court.

The defendant claims that he signed the notes as an accommodation maker and that the master erred in ruling that he was a principal maker. Based on RSA 382-A:3-606 regarding the rights of accommodation makers upon impairment of recourse and collateral, he asserts several grounds for discharge from his liability on the three notes.

He first argues that a discharge is warranted because the plaintiffs impaired his right of recourse against Chesson and Levesque by releasing these individuals without expressly reserving any rights on the docket markings. He next contends that the mortgage releases by the Merchants Savings Bank and the Greatstone

Development Corporation constituted an unjustifiable impairment of collateral without his consent because the consideration for the releases was insufficient. He further argues that an impairment of the Bedford collateral resulted from defects in the foreclosure proceedings. Specifically, he claims that the numerous postponements of the foreclosure sale and the paucity of bidders rendered the sale price less than the fair market value of the property. Finally, he argues that the $20,000 rebate given to Rolling Stones, Inc., and the waiver of all claims regarding the missing acres, impaired the Bedford collateral by reducing the size of this parcel. Accordingly, he claims that the master should have allocated the proceeds of the rebate to reduce his liability.

The defendant bases all of these arguments on his alleged status as an accommodation maker. He correctly recognizes that the defenses in RSA 382-A:3-606 which he relies upon apply only to sureties and are not available to principals. *See* Uniform Laws Comments to RSA 382-A:3-606; *accord Wohlhuter v. St. Charles Lumber & Fuel Co.*, 25 Ill. App. 3d 812, 815-16, 323 N.E.2d 134, 136-37 (1975). Thus, the threshold question for our determination is whether the master properly found that the defendant signed the notes as a principal maker and not as an accommodation maker.

▆▆ We will uphold a master's findings "unless they are unsupported by the evidence or are erroneous as a matter of law." *Summit Electric, Inc. v. Pepin Brothers Const., Inc.*, 121 N.H. 203, 206, 427 A.2d 505, 507 (1981). We will not usurp the master's role as fact-finder. *Suojanen v. Tardif*, 121 N.H. 1036, 1038, 437 A.2d 310, 311 (1981).

▆ RSA 382-A:3-415(1) provides that "[a]n accommodation party is one who signs the instrument in any capacity for the purpose of lending his name to another party to it." Whether an individual is an accommodation party presents a question of fact; the trial court should focus on the intentions of the parties as reflected by the language of the pertinent instrument and by the surrounding circumstances. *See Godfrey State Bank v. Mundy*, 90 Ill. App. 3d 142, 144-45, 412 N.E.2d 1131, 1134-35 (1980); *Kerney v. Kerney*, 386 A.2d 1100, 1102 (R.I. 1978); Annot., 90 A.L.R.3d 342, 350-65 (1979).

▆ In this case, none of the notes identified the defendant and the other individual signatories as accommodation parties. To the contrary, the Merchants Savings Bank note conspicuously stated that the signatories were liable "jointly and severally as princi-

pals." The evidence indicated that the individual signatories were the controlling stockholders of Rolling Stones, Inc., and that they would each derive substantial personal benefits from application of the loan proceeds. The evidence also revealed that the major shareholder of Pilgrim Plaza, Inc., and Greatstone Development Corporation knew that Rolling Stones, Inc., was not officially incorporated at the time of the execution of the instruments. Based on the express language in the Merchants Savings Bank note, as well as the individual signatories' direct interest in all of the loan proceeds, and the corporate lenders' knowledge of the legal status of Rolling Stones, Inc., on October 27, 1971, the master could rationally have concluded that the defendant and the other signatories were principals. *See Common Wealth Ins. Systems, Inc. v. Kersten,* 40 Cal. App. 3d 1014, 1029, 115 Cal. Rptr. 653, 663 (1974); *Wohlhuter v. St. Charles Lumber & Fuel Co.,* 25 Ill. App. 3d at 816–17, 323 N.E.2d at 137.

■ Even assuming *arguendo* that the defendant signed the notes as an accommodation maker, we find that the record before us does not reveal any impairment of recourse or collateral warranting a discharge from liability. RSA 382–A:3–606 states that a holder who expressly reserves his rights against a second party also preserves the second party's right of recourse against others. Consistent with this provision, we hold that the plaintiffs' express reservation of rights against the defendant, contained in the instruments releasing Chesson and Levesque, was sufficient to preserve the defendant's right of recourse against these two individuals. The plaintiffs' failure to include a reservation of rights in the docket markings was inconsequential.

■■ In addition, we find that the defendant failed to offer adequate evidence that the mortgage releases by the Merchants Savings Bank and the Greatstone Development Corporation actually impaired the collateral. Under the provisions of our commercial code, a defendant has the burden of proving all defenses by a preponderance of the evidence. Uniform Laws Comments to RSA 382–A:3–307. The defendant in this case offered insufficient evidence regarding the *fair market value* of the respective properties *at the time of the mortgage releases*. He merely argued that an impairment of collateral resulted because the amount of consideration for releasing the Londonderry mortgages was less than the value at which the bank previously appraised the property, while the consideration for release of the Laconia and Merrimack mortgages was less than the original sales prices to Rolling Stones, Inc. We find that the previous *loan appraisal value* by the bank, a

party that had a clear interest in the property, was not determinative of the fair market value of the Londonderry property at the time of the mortgage release. Similarly, the prices which Rolling Stones, Inc. *originally* paid for the Laconia and Merrimack tracts did not constitute sufficient evidence of the fair market value of these properties *at the time of the mortgage releases*. The defendant thus failed to satisfy his burden of proof.

■ We also reject the defendant's argument that defective foreclosure proceedings impaired the Bedford collateral. As previously mentioned, the foreclosure sale was well advertised, and numerous individuals, including the defendant, attended. The defendant failed to provide sufficient evidence of bad faith on the part of the plaintiffs. *See generally Meredith v. Fisher*, 121 N.H. 856, 859, 435 A.2d 536, 537–38 (1981); *Merrimack Industrial Trust v. First Nat. Bank of Boston*, 121 N.H. 197, 200–02, 427 A.2d 500, 503–04 (1981); *Lakes Region Fin. Corp. v. Goodhue Boat Yard, Inc.*, 118 N.H. 103, 107–08, 382 A.2d 1108, 1111 (1978). Furthermore, he did not prove that the foreclosure sale price was unconscionably low; he offered no evidence regarding the fair market value of the Bedford tract at the time of the foreclosure sale. In view of the record before us, we cannot say that the forclosure proceedings violated the mortgagees' duty of good faith and impaired the Bedford collateral. *See Merrimack Industrial Trust v. First Nat. Bank of Boston*, 121 N.H. at 202, 427 A.2d at 504.

■ Finally, we dismiss the defendant's claim that the $20,000 rebate for the missing Bedford acres constituted an impairment of that collateral. In disposing of this claim, we simply note that the granting of the rebate did not alter or reduce the number of Bedford acres which the buyers had in fact pledged. The rebate merely reduced the sellers' liability for the alleged misrepresentation in the purchase-and-sale agreement.

In sum, even if the defendant were an accommodation maker, we find on the facts of this case that he would not be entitled to a discharge under the suretyship defenses in RSA 382–A:3–606.

Apart from the suretyship issues discussed above, the defendant argues that the master erred in his award of attorney's fees under the provisions of the Pilgrim Plaza and Greatstone notes. He claims that the evidence did not support an award of attorney's fees equal to fifteen percent of the balance due on the loans.

■ We disagree. As previously mentioned, the Pilgrim Plaza and Greatstone notes specifically provided for the collection of reasonable attorney's fees. The record revealed that counsel repre-

sented the plaintiffs throughout this lengthy litigation. The evidence also indicated that the litigation involved a substantial sum of money, and that the nature of the underlying subject matter was above average in difficulty. After considering these facts, we conclude that the master's award of fifteen percent attorney's fees was not unwarranted. *See Couture v. Mammoth Groceries, Inc.,* 117 N.H. 294, 296, 371 A.2d 1184, 1186 (1977). *See generally* MODEL CODE OF PROFESSIONAL RESPONSIBILITY, DR 2-106(B) and EC 2-18 (1981).

*Affirmed.*

All concurred.