FEDERAL DEPOSIT INSURANCE
CORPORATION, in its corporate
capacity, Plaintiff,

v.

BLUE ROCK SHOPPING CENTER, INC.,
a Delaware corporation, Max Ambach
and Rose Ambach, Defendants.

Civ. A. No. 80–398–JLL.

United States District Court,
D. Delaware.

Dec. 4, 1987.

Gregory A. Inskip of Potter, Anderson & Corroon, Wilmington, Del., for plaintiff.

Paul P. Welsh and Palmer L. Whisenant of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., for defendants.

### MEMORANDUM OPINION

LATCHUM, Senior District Judge.

### NATURE OF THE ACTION

These findings of fact and conclusions of law relate to a civil action instituted by plaintiff, Federal Deposit Insurance Corporation ("FDIC"), in its corporate capacity, on a bond and warrant (Plaintiff's Trial

Exhibit ["PX"] 1) delivered to Farmers Bank of the State of Delaware ("Farmers") and executed by defendant Blue Rock Shopping Center, Inc. ("Blue Rock") and individually by defendants Max and Rose Ambach. FDIC seeks to collect a total of $523,105.71 in unpaid principal on the bond and warrant, as well as interest accruing at a 6.25 annual percentage rate from October 22, 1982 to the date of judgment. (*See* Docket Items ["D.I."] 1 and 43.) Defendants in their answers denied liability and asserted three affirmative defenses. In addition, defendants brought a third party action against Farmers (D.I. 26) in which they had contended that even assuming their liability to FDIC, defendants were entitled to $275,000 plus interest from Farmers.

This Court issued an opinion and order dated June 28, 1983 (D.I. 56 and 57), as modified on June 29, 1983 (D.I. 58), and reported in 567 F.Supp. 952 (D.Del.1983), in which the Court granted FDIC's summary judgment motion and struck defendants' Third Affirmative Defense (D.I. 44), which had been raised by amendment to its Answer. On October 25, 1983, this Court entered final judgment in favor of FDIC, and in favor of Farmers on defendants' third party claim. (D.I. 70.)

Defendants appealed to the United States Court of Appeals for the Third Circuit, which affirmed in part and vacated and remanded in part. *See Federal Deposit Ins. Corp. v. Blue Rock Shopping Center*, 766 F.2d 744 (3d Cir.1985). Specifically, the Third Circuit affirmed this Court's judgment in favor of FDIC against Blue Rock on the bond. The appellate court, however, did not consider this Court's judgment in favor of Farmers on the third party claim because defendants failed to appeal that judgment. Consequently, the Third Circuit remanded the case for trial only on the issues raised by the Third Affirmative Defense of Max and Rose Ambach: (1) whether the Ambachs were sureties with a right of recourse against Blue Rock; and (2) if so, whether the Ambachs could prove that FDIC unjustifiably impaired the collateral securing the bond and warrant. *See* 766 F.2d at 751.

On September 8, 1987, this Court held a non-jury trial in order to try these remaining issues. After carefully considering the sufficiency and weight of the testimony adduced at trial (*see* D.I. 108), the documents admitted into evidence, the entire case file, the demeanor and credibility of the witnesses, and the post-trial briefs of the parties (D.I. 111, 112, 115, and 115A), and pursuant to the requirements of Fed.R. Civ.P. 52(a), the Court enters this opinion setting forth its findings of fact and conclusions of law.

## FACTS

### I. The Status Of The Ambachs

On September 29, 1966, defendants Blue Rock, Max Ambach, and his wife, Rose Ambach, executed and delivered to Farmers a Bond and Warrant ("Bond") in which they promised "jointly and severally" to pay Farmers the sum of $800,000, plus interest at the rate of 6.25 percent per annum. (PX 1.)

At this time, William F. Lynch II, Esquire, was the personal attorney of Max Ambach (Trial Transcript ["Tr."] at 46), as well as legal counsel for Blue Rock. (*Id.* at 60–61.) Mr. Lynch thus served as the settlement attorney on an $800,000 permanent financing loan ("loan"), which the Bond evidenced and which Farmers provided for replacement of the original construction loan to build the Atlantic Thrift Building at the Blue Rock Shopping Center. (*Id.* at 46–47.) In his efforts to document the permanent loan, Mr. Lynch initially prepared a Bond and Warrant (Defendants' Trial Exhibit ["DX"] 11) which was executed only by Blue Rock. (Tr. at 49–50.) Upon the request of Farmers, however, (*see* DX 4; DX 5; Tr. at 51), Mr. Lynch promptly substituted the Bond in question (PX 1), after having Max and Rose Ambach personally sign it, making them "jointly and severally" liable with Blue Rock on the obligation. (*See* PX 1; Tr. at 48–51.) Mr. Lynch did not have the Ambachs execute a separate document indicating suretyship status because he knew, based upon prior transactions between Farmers and the Am-

bachs, that Farmers desired the Ambachs to be co-makers on the Bond. (Tr. at 58.) Furthermore, Mr. Lynch's conversations with the president of Farmers led him to believe that Farmers felt that "it ha[d] more ... latitude if the individuals are right on the ... note or bond and warrant than if they're subject to a separate guarantee or subject to an endorsement." (*Id.* at 59.) The ledger card which Farmers opened on the permanent loan identified the account as that of "Blue Rock Shopping Center and Max & Rose Ambach." (PX 47.)

The Court finds that there was never any formal agreement, oral or written, between Blue Rock and the Ambachs which would indicate that the Ambachs were signing the Bond as sureties. (Tr. at 32.) The Court also finds that the proceeds of the $800,000 permanent loan were applied in part to pay off the remaining balance of $534,321.48 on a Farmers construction mortgage loan bearing the Ambachs' personal signatures. (DX 3; Tr. at 28.) This prior mortgage loan had been used to finance the construction of Blue Rock Shopping Center. (Tr. at 28.)

At all times in question, Max Ambach was the president and sole shareholder in Blue Rock. (PX 43, Defendants' Response to Plaintiff's Third Set of Interrogatories and Third Request for Production, Answer to Interrogatory No. 1 [hereinafter "Interrogatory No. 1"]; Tr. at 19.) Rose Ambach was the vice president of Blue Rock. (PX 43, Interrogatory No. 1.) As of March 31, 1975, Blue Rock had made substantial loans "to or for the benefit of Max Ambach, [Blue Rock's] sole stockholder," evidenced by notes in the amounts of $202,-600.56, $229,228.58, and $5,000. (PX 45, Statement of Affairs for Bankrupt Engaged in Business, at 6.) By August, 1976, the loans which Blue Rock had made to Max Ambach or his related entities exceeded $470,000. (PX 45, Debtor's Schedules at 5.) Ambach never repaid these loans to Blue Rock. (Tr. at 38.)

## II. The Collateral For The Loan

The Bond was secured by a first mortgage on a parcel of real estate located at the Blue Rock Shopping Center in Wilmington, Delaware. On the same date as the Bond's delivery, Blue Rock, by its president, Max Ambach, executed and delivered to Farmers as additional collateral for the Bond an assignment of Blue Rock's interest in a lease ("Assignment of Lease") of the parcel of land known as the Blue Rock Shopping Center ("Shopping Center"), on which was erected the Atlantic Thrift Building, which Blue Rock had previously leased to A.T.C. of Wilmington, Inc. ("ATC"). The term of the ATC lease was for 15 years and ran from November 1, 1965 to October 31, 1980. ATC's lease payments assigned to Farmers coincided with defendants' installment obligations under the Bond and the Mortgage. The payments to be made under the lease by ATC were guaranteed by Atlantic Thrift Centers, Inc. (D.I. 21, Ex. C.) As a result of several corporate mergers, the lease payments ultimately were guaranteed by Arlen Realty and Development Corporation ("Arlen"). (D.I. 21, ¶ 6.)

On July 29, 1975, Blue Rock defaulted under the first mortgage and its obligations on the Bond. Blue Rock's default resulted from the concomitant default of ATC and Arlen, when ATC simply closed its store at the Shopping Center, moved out, and suspended its rent payments to Farmers. (Tr. at 25–26, 29; DX 18.) By letter dated August 12, 1975, defendants notified the vice president of Farmers that ATC and Arlen had discontinued their retail operation at the Shopping Center. (PX 2.) In the letter, defendants requested that Farmers accept Arlen's settlement proposal to pay $100,000 for an agreement to immediately terminate the lease and surrender the premises, as well as Arlen's promise to pay an additional $24,000 if the premises were not retenanted within one year. (PX 2; Tr. at 26–26a.) Out of this $100,000 settlement, defendants proposed to advance Farmers eight monthly mortgage payments (approximately $50,000), with the remainder to be retained by Blue Rock. (PX 2; Tr. at 108.) As of the date of this proposal, and at all times thereafter, neither the Ambachs nor Blue Rock had the

resources to pursue litigation against Arlen. (Tr. at 42.)

Farmers rejected defendants' settlement proposal. Instead, on February 10, 1976, Farmers agreed to accept Blue Rock's assignment of its right, title and interest in the Arlen guarantee in return for Farmers' forbearance from enforcing its rights arising from Blue Rock's default. (DX 21.) On March 10, 1976, Farmers then filed an action in the Superior Court of the State of Delaware in and for New Castle County[1] ("Superior Court suit") against Arlen on its guarantee of the lease payments. (*See* DX 1, Tab 1.)

In accordance with the provisions of an Assistance Agreement dated May 20, 1976, between the FDIC and Farmers, Farmers on October 25, 1976, assigned to the FDIC all of its right, title and interest in: (1) the Bond and Mortgage, (2) the Assignment of Lease which was executed by Blue Rock and ATC, and (3) the guaranty of the lease payments executed by Atlantic Thrift Center, Inc., and later assumed by Arlen. (PX 11; PX 12.)

In the interim, Blue Rock filed a Chapter 11 bankruptcy proceeding in the United States Bankruptcy Court for the District of Delaware on August 9, 1976. About this time, Max Ambach, as President of Blue Rock, was contacted by Zander Foods, Inc. ("Zander") about renting the building abandoned by ATC. (Tr. at 56.) In an attempt to lease the building to Zander, FDIC and its counsel cooperated with Blue Rock's counsel and receiver in bankruptcy during late 1976 and early 1977. (*Id.* at 62–63; PX 13; PX 14; PX 15; PX 46.) Court approval for the lease to Zander was obtained on March 11, 1977. (PX 46.) Zander, however, never honored its lease and never occupied the building. (PX 17.)

During the time when Zander's occupancy of the property seemed imminent, FDIC's attorney, David A. Anderson, Esquire, made a demand for $163,324.00 from Arlen. (PX 15.) When it became apparent that Zander would not honor its lease,

Anderson so informed Arlen's attorney, Daniel M. Kristol, Esquire, and again made the same demand two months later. (PX 17.) According to a record of a telephone conversation with Kristol on August 4, 1977, Arlen was "going to look at" the demand. (PX 18.)

On January 10, 1978, FDIC filed an amended complaint against Arlen. (DX 1, Tab 10.) FDIC then attempted to move Arlen toward a settlement. Kristol was informed on February 15, 1978, that the matter would be moved toward trial unless Arlen expressed some kind of interest in settlement. (PX 19.) On March 28, 1978, attorneys for Arlen and FDIC held a meeting in which FDIC's counsel stated FDIC's position that it was "entitled to the full amount of the lease, $442,000.00 or the past due rents right now, $238,000." (PX 21.)

On April 11, 1978, counsel for Arlen made a settlement offer of $175,000, to be paid monthly over a five-year period. (PX 22.) FDIC rejected the proposal six days later, although it indicated that it was willing to consider a "one-time cash payment to settle [the] obligation." (PX 23.) By letter dated May 9, 1978, counsel for Arlen proposed a $220,000 settlement, consisting of a $100,000 payment and twelve monthly payments of $10,000. (PX 25.) Counsel for FDIC responded by letter dated July 27, 1978, which set forth detailed terms and conditions of a settlement agreement. (PX 26.) The next three months witnessed attempts by the parties to reach a final settlement. (*See* DX 65; DX 66; DX 69; DX 70; DX 71; PX 29.)

During this time, R.H. Hoffman, an FDIC liquidator in New York, became aware of the proposed settlement. (*See* PX 27.) In a September 11, 1978 memorandum to George W. Hill, Director of FDIC's Division of Liquidation, Hoffman noted that other large creditors of Arlen had been negotiating with Arlen about restructuring its debt. (*Id.*) Hoffman informed Hill that "[i]f Arlen trie[d] to make the payment to

---

1. The action was filed on March 10, 1976, in the Superior Court of the State of Delaware, in and for New Castle County, C.A. No. 298.

the FDIC against the wishes of the other lenders," it was probable that the other lenders would "force [Arlen] into default and possibly into bankruptcy." (*Id.*)

In November 1978, Arlen presented a financial restructuring proposal to all its creditors. (*See* PX 38 at 00392.) The proposal offered creditors $0.25 on $1.00 of principal, to be paid within one year from date of acceptance, and listed total restructured unsecured debts of $77,445,000. (*Id.*) Of this amount, Arlen included debts to FDIC totaling $1,720,826.71. (*Id.*) By February 7, 1979, Arlen's New York counsel informed FDIC's counsel that Arlen was "going under." (PX 30.)

On April 2, 1979, Arlen offered FDIC $93,000 as full settlement on the lease obligation. (PX 31.) Subsequent communications indicate that Arlen had offered to settle for twenty-five cents on the dollar (which would be either $78,250 on the $313,000 then due or FDIC's preference of $110,584.02 on the total lease amount of $442,336.06). (*See* PX 33 at 00358.) By December, 1980, Arlen eventually agreed to settle for approximately thirty-three cents on the dollar. (*See* PX 38 at 00387–88, 00394–95.) On October 30, 1980, the Board of Directors of FDIC had approved a settlement whereby Arlen would satisfy the Arlen guarantee by paying $147,240 in eighteen monthly installments of $8,180.00. (PX 39.) Arlen eventually paid $148,467 on account of its guarantee on the lease payments. (Pretrial Order at 5.) On November 12, 1982, FDIC dismissed its claims in the Superior Court suit. (*Id.*) After settlement, a deficiency balance of $523,105.71 remained on the Bond as of October 22, 1982, on which interest is running at 6.25 percent per annum. (*Id.*) [2]

## THE LAW

### I. The Ambachs Did Not Sign The Bond As Sureties

■ The Ambachs may not claim the impairment of collateral defense provided by § 3–606(1)(b) of the Uniform Commercial Code [3] unless they first can bear their burden of proving by a preponderance of the evidence that they signed the Bond as accommodation makers for Blue Rock, and

---

**2.** On January 8, 1980, the premises used for the Shopping Center were sold to the highest bidder for $325,000 at a public sheriff's sale on a writ of monition issued by the City of Wilmington to collect unpaid taxes that had accrued on the property. (Pretrial Order at 4–5.) On April 21, 1980, the FDIC received proceeds of the sheriff's sale amounting to $188,115.33, which was applied to reduce defendants' obligations on the Bond. (*Id.* at 5.)

**3.** In supplying its rule of decision in the case above, the Third Circuit explained that federal common law controls. *See* 766 F.2d at 748. Nevertheless, the court above also noted that where federal law leaves apertures, state precedent may be used interstitially. *Id.* For the most part, however, this Court must look to federal common law and to the Model Uniform Commercial Code ("UCC") for proper resolution of the issues presented on remand.

Section 3–606(1) of the UCC provides that "[a] holder discharges any party to the instrument to the extent that without such party's consent the holder ... (b) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse." Obviously, a critical factor for correct application of this section is a determination of the meaning of "any party," and thus whether the section serves to protect even a maker or co-maker of a note.

In its initial resolution of this question, this Court adopted the approach taken by a majority of courts and clearly articulated by the Fifth Circuit Court of Appeals in *United States v. Unum,* 658 F.2d 300, 304–05 (5th Cir.), *reh. denied,* 664 F.2d 289 (1981). The *Unum* court explained that the § 3–606 defense extended to sureties, but not to makers of a note. 658 F.2d at 304–05. Thus, this Court held that § 3–606 "does not operate to discharge a co-maker on a note, as opposed to an accommodation maker." 567 F.Supp. at 957. Consequently, the Ambachs, as co-makers on the note, were not afforded the possibility of a § 3–606(1)(b) defense.

On appeal, the Third Circuit essentially followed the *Unum* court's line of reasoning that § 3–606 should apply only to sureties. 766 F.2d at 749. The court above broadened that line, however, and thereby necessitated this remand, by holding that "a co-maker who signs a note to accommodate the primary obligor and who has a right of recourse against the primary obligor is a surety who can assert the defense of 3–606(1)(b)." *Id.* This Court, therefore, had the task of determining (1) whether the Ambachs, as co-makers on the note, signed to accommodate Blue Rock, and had a right of recourse against Blue Rock, and (2) if they did sign as accommodation makers, whether FDIC unjustifiably impaired the collateral securing the bond.

not as principal obligors. *See* 766 F.2d at 749; *see also supra* note 3. It is not enough for Max Ambach to now testify as an afterthought that he and his wife signed the Bond as sureties.[4] Rather, the Ambachs bore the burden of producing evidence of their suretyship status at trial; they failed to do so in every respect. Section 3–415(1) of the UCC defines an accommodation party as "one who signs the instrument in any capacity for the purpose of lending his name to another party to it." It is generally recognized that "[t]he intention of the parties is determinative of whether a person signing a negotiable instrument is an accommodation party, and if the intention of the parties is not expressed on the instrument itself, it must be ascertained from the facts and circumstances connected with the transaction and the parties to it." Annot., 90 A.L.R.3d 342, 347 (1979) (citing 2 Anderson, Uniform Commercial Code [2d ed. 1971] § 3–415:9.)

First, it is clear from the face of the Bond—the only document placed into evidence which evinces an agreement between Blue Rock and the Ambachs—that an intention to sign as accommodation makers was not expressed on the instrument itself. (*See* PX 1.) A leading commentator on the UCC has noted "the necessity for a corporate officer or shareholder clearly to indicate his status when he signs an instrument as an accommodation party." White and Summers, Uniform Commercial Code, § 13–13, at 522 (2d ed. 1980). Nowhere on the face of the bond or in any written document is there any such indication. (*See* PX 1.) In fact, the Bond expressly states that the Ambachs bound themselves with Blue Rock "jointly and severally" on the obligation. (*Id.*) The existence of joint and several liability has been considered significant in determining that a party was a principal obligor rather than an accommodation party. *See Campo v. Maloney*, 122 N.H. 162, 442 A.2d 997, 1001 (1982).

Second, the testimony of Max Ambach also failed to produce any evidence of the Ambachs' suretyship status. To the contrary, rather than testifying that he intended at the time to sign the Bond to accommodate Blue Rock, Mr. Ambach testified that he had no specific recall of having signed the Bond at all. (Tr. at 21–22.) Furthermore, Mr. Ambach's testimony indicated that there was never any agreement between Blue Rock and the Ambachs that they were signing the Bond as sureties. On cross-examination, Max Ambach testified as follows:

Q: Do you recall whether there was ever any agreement between Blue Rock and you and your wife that you and your wife were signing [the Bond] as sureties?

A: No, sir.

Q: There was never any formal agreement between you and Blue Rock at all with respect to [the Bond], was there?

A: No, sir.

(Tr. at 32.)

The only other evidence presented at trial concerning the circumstances surrounding the transaction also indicated that the Ambachs were not sureties. William F. Lynch II, Esquire, the attorney who prepared the Bond, testified that he was familiar with Farmers' lending practices. (Tr. at 57.) He further testified that the president of Farmers had indicated that Farmers wanted the Ambachs' signatures directly on the Bond because that would give Farmers "more latitude" than a separate endorsement. (*Id.* at 59.) Furthermore, the mortgage ledger card which Farmers opened for the loan named the account as that of "Blue Rock Shopping Center and Max & Rose Ambach." (PX 47.) This contemporary evidence certainly suggests that the bank considered the Ambachs to be principal obligors on the loan. In any event, the Ambachs failed to produce any evidence to rebut this inference.

Finally, plaintiff introduced evidence at trial which suggests that rather than merely accommodating Blue Rock, the Ambachs were receiving a direct benefit from Farmers' loan to the corporation. At the very

---

**4.** Rose Ambach did not testify at trial and therefore provided no evidence as to the Ambachs' signing status.

least, the loan provided a personal benefit to the Ambachs because it was used in part to pay off the prior construction loan on which they were admittedly co-signors. (*See* DX 3; Tr. at 28.) Moreover, Max Ambach owned all the stock in Blue Rock. (*See* PX 43.) As of August, 1976, Ambach had borrowed nearly one-half million dollars from Blue Rock. (*See* PX 45, Debtor's Schedules, at 5.) The Statement of Affairs for Bankrupt Engaged in Business (PX 45) enumerated two loans in particular, which were made by Blue Rock to Max Ambach in the amounts of $202,600.56 and $229,228.58. It has been noted that where the proceeds of a note are used to pay the debts of a corporation, and the corporation's sole shareholders sign the note as co-makers, the resultant benefit to the co-makers raises a strong inference that the shareholders are not accommodation makers but rather principal obligors. *See Harrington v. United States*, 605 F.Supp. 53, 58 (D.Del.1985). The circumstances surrounding the Ambachs' signing and the subsequent indebtedness to Blue Rock permit just such an inference.

The Court therefore concludes that the Ambachs have failed to carry their burden of proving by a preponderance of the evidence that they were sureties on the Bond. Consequently, they cannot assert the defense afforded by § 3–606(1)(b) of the U.C.C.

## II. Plaintiff Did Not Unjustifiably Impair The Collateral Securing The Bond

■ Because the Court has found that the Ambachs were not sureties on the Bond, it is not necessary to address the impairment of collateral issue. (*See supra* note 3.) Nevertheless, the Court notes that even assuming that the Ambachs *were* sureties, they have failed to prove by a preponderance of the evidence that the collateral securing the Bond was unjustifiably impaired.

Defendants proffered two main arguments to support their defense of impairment of collateral. (*See* Pretrial Order at 6–7.) First, defendants argued that FDIC, by its predecessor, Farmers, had unjustifiably impaired the value of the Arlen guarantee by rejecting Arlen's August 12, 1975 settlement offer. (*See* Pretrial Order at 6.) Max Ambach testified that neither he and his wife nor Blue Rock had the money to pursue litigation against Arlen, either at the time of this offer, or at any time afterward. (Tr. at 42.) Therefore, the value of the Arlen claim to defendants was worth no more than the August 12, 1975 offer.

With this in mind, plaintiff introduced evidence establishing that the $523,105.71 balance due on the Bond after FDIC's recovery did not differ substantially from the amount that would have been due if the August 12, 1975 settlement proposal had been accepted. Kathleen Barry, an FDIC loan workout specialist, presented three hypothetical scenarios to illustrate this point. (*See* Tr. at 105–113; PX 48.) Arlen had offered an immediate $100,000 payment as of August 12, 1975, with a $24,000 payment to follow in a year. (*See* PX 2.) Under the first scenario, Barry assumed that the $100,000 was paid on August 12, 1975, but that Arlen defaulted on the $24,000 payment due on August 12, 1976. (*See* PX 48; Tr. at 108.) According to Barry's calculations, this situation would have resulted in a balance of $528,909.95 due on the Bond as of October 22, 1982.[5] In the second scenario, Barry assumed that Arlen made both the $100,000 and $24,000 payments on time. (*See* PX 48; Tr. at 107–108.) Under these circumstances, the bal-

---

5. Scenario #1: $100,000 paid on 8/12/75 (default on $24,000)

| | | |
|---|---|---:|
| (a) | Balance due as of 6/29/75 | $571,914.49 |
| (b) | Interest accruing b/w 6/29/75 to 8/12/75 | + 4,308.94 |
| | | 576,223.43 |
| (c) | Payment on 8/12/75 | − 100,000.00 |
| | | 476,223.43 |
| (d) | Interest accruing b/w 8/12/75 and 4/23/80 | + 139,931.41 |
| | | 616,154.84 |
| (e) | Insurance payments | + 29,430.00 |
| | | 645,584.84 |
| (f) | Payment from foreclosure on 4/30/80 | − 188,115.33 |
| | | 457,469.51 |
| (g) | Interest accruing b/w 4/23/80 and 10/22/82 | + 71,440.44 |
| | | $528,909.95 |
| | Amount actually due on 10/22/82 | $523,105.71 |
| | Amount due under hypothetical | $528,909.95 |

ance due on October 22, 1982, would have been $501,162.00.[6] Finally, based on Max Ambach's actual proposal to Farmers (*see* PX 2), Barry assumed that Farmers received only $52,632 from nine monthly payments,[7] with Blue Rock to retain the balance. (*See* PX 48; Tr. at 108.) Barry's calculations determined that this scheme would have resulted in a balance due of $599,767.11.[8] Therefore, even when viewed in a light most favorable to defendants, the rejection of the August 12, 1975 settlement offer did not unjustly impair the value of the Arlen guarantee. Plaintiff's evidence suggests that under no circumstances would the offer's acceptance have resulted in a balance that was significantly less than the $523,105.71 which actually remained after FDIC's recovery from its 1980–81 settlement with Arlen. In any event, defendants failed to carry their burden of producing evidence which would prove otherwise.

Defendants' second argument was that the suit against Arlen was poorly handled by Farmers and/or FDIC, resulting in an inadequate recovery. (*See* Pretrial order at 6–7.) Edward T. Ciconte, Esquire, a local commercial collection law attorney, was the only witness presented by defendants offering evidence that plaintiff should have obtained a greater recovery. Mr. Ciconte's testimony, however, was both confusing and contradictory and therefore entitled to very little weight.

For example, Mr. Ciconte testified that in the Superior Court of Delaware in 1976, a nonjury case could be moved from complaint to trial within six months to a year. (Tr. at 73.) Mr. Ciconte based this opinion on docket sheets contained in a defense exhibit. (*See* DX 2.) On cross-examination, however, Mr. Ciconte admitted that he had not reviewed the underlying pleadings in the cases listed in that exhibit. (Tr. at 100.) He therefore had no idea whether any of those cases involved the abandonment of a lease, as in the Arlen suit. (*Id.* at 101.)

Similarly, Mr. Ciconte testified that, other than the amount of money awarded, this particular collection matter was a very uncomplicated one. (*Id.* at 69.) He contended that the defenses asserted by Arlen were the typical boilerplate defenses found in any collection case, and none would create any concern from a plaintiff's standpoint. (*Id.* at 74.) However, Mr. Ciconte conceded on cross-examination that when a tenant abandons a tenancy, a landlord generally has a duty to mitigate damages by attempting to re-lease the property. (*Id.* at 94.) He thereby acknowledged that if in

---

6. Scenario #2: $100,000 paid on 8/12/75 and $24,000 paid on 8/12/76

| | | |
|---|---|---:|
| (a) | Balance due as of 6/29/75 | $571,914.49 |
| (b) | Interest accruing b/w 6/29/75 and 8/12/75 | + 4,308.94 |
| | | 576,223.43 |
| (c) | Payment on 8/12/75 | −100,000.00 |
| | | 476,223.43 |
| (d) | Interest accruing b/w 8/12/75 and 6/12/76 | + 23,974.26 |
| | | 500,197.69 |
| (e) | Payment on 8/12/76 | − 24,000.00 |
| | | 476,197.69 |
| (f) | Insurance payments | + 29,430.00 |
| | | 505,627.69 |
| (g) | Payment from foreclosure on 4/23/80 | −188,115.33 |
| | | 317,512.36 |
| (h) | Interest accruing b/w 6/12/76 and 4/23/80 | +115,957.14 |
| | | 433,469.50 |
| (i) | Interest accruing b/w 4/23/80 and 10/22/82 | + 67,692.50 |
| | | $501,162.00 |
| | Amount actually due on 10/22/82 | $523,105.71 |
| | Amount due under hypothetical | $501,162.00 |

7. Barry assumed that Ambach made the eight monthly payments proposed in the August 12, 1975 letter (*see* PX 2), plus the one delinquent payment. (Tr. at 108.)

8. Scenario #3: $52,632 paid in 9 installments of $5,848

| | | |
|---|---|---:|
| (a) | Balance due as of 6/29/75 | $571,914.49 |
| (b) | Interest accruing b/w 6/29/75 and 8/12/75 | + 4,308.94 |
| | | 576,223.43 |
| (c) | Payment of $52,632 | − 52,632.00 |
| | | 523,591.43 |
| (d) | Interest accruing b/w 8/12/75 and 4/23/80 | +153,849.81 |
| | | 677,441.24 |
| (e) | Insurance payments | + 29,430.00 |
| | | 706,871.24 |
| (f) | Payment from foreclosure on 4/23/80 | −188,115.33 |
| | | 518,755.91 |
| (g) | Interest accruing b/w 4/23/80 and 10/22/82 | + 81,011.20 |
| | | $599,767.11 |
| | Amount actually due on 10/22/82 | $523,105.71 |
| | Amount due under hypothetical | $599,767.11 |

fact such a duty existed, then Arlen would have had the prerogative to defend on this issue. (*Id.* at 100.) Ciconte admitted that such litigation could entail extensive discovery, including expert testimony, as to the diligence of the landlord's efforts. (*Id.*) These concessions belie Mr. Ciconte's testimony that the Arlen claim was a simple collection case. (*See id.* at 69.) In fact, Arlen pleaded the duty to mitigate as an affirmative defense in its Answer to plaintiff's amended complaint. (*See* DX 1, Tab 11 at 3.)

Furthermore, Mr. Ciconte's opinion as to the value of the recovery secured by FDIC was based on a mistaken assumption of fact. Defense counsel asked Mr. Ciconte to give his opinion on whether FDIC's recovery of "twenty-five cents on the dollar" on the Arlen claim was an adequate result. (Tr. at 80.) Mr. Ciconte's opinion that this was "a terrible result" carries little weight because FDIC actually obtained a recovery worth thirty-three cents on the dollar, based on the amount outstanding on the original lease obligation. (*See* PX 38 at 00394–95.) Once again, the Court can give little weight to such testimony, because its factual premise is incorrect.

Official Code Comment 5 to § 3–606 explains that § 9–207 sets the standard for determining when a creditor's actions in dealing with collateral are "unjustifiable." U.C.C. § 3–606, Comment 5 (1977). Section 9–207 states that "[a] secured party must use reasonable care in the custody and preservation of the collateral in his possession." Stated simply, defendants have failed to carry their burden of proof that plaintiff failed to exercise such reasonable care.

## CONCLUSION

The Court therefore concludes, based on the credible evidence adduced at trial, that defendants Max and Rose Ambach have not borne their burden of proving by a preponderance of the evidence (1) that they signed the Bond as sureties with a right of recourse against Blue Rock, or in the alternative, even assuming that they had signed as sureties, (2) that plaintiff, FDIC, had unjustifiably impaired the collateral securing the Bond: namely, Arlen's guarantee of the lease payments. Plaintiff, FDIC, is therefore entitled to a judgment against the Ambachs in the amount of the deficiency balance of $523,105.71 remaining on the Bond as of October 22, 1982, with interest thereafter running at 6.25 percent per annum.

Judgment will be entered against Max and Rose Ambach [9] in accordance with the findings of fact and the conclusions of law set forth above.[10]

---

**9.** The prior judgment entered in this case on June 28, 1983 (D.I. 57) in favor of FDIC was affirmed by the Court of Appeals as to Blue Rock Shopping Center, Inc. *See* 766 F.2d at 754. Therefore, the judgment to be entered in accordance with the present findings of fact and conclusions of law relates only to Max Ambach and Rose Ambach, as co-makers on the instrument.

**10.** In the event this decision and judgment entered hereby is again appealed, the Court of Appeals may very well want to reconsider its opinion relating to the effect of 12 U.S.C. § 1823(e), appearing in 766 F.2d at 752–54, in light of the recent United States Supreme Court opinion in *Langley, et ux. v. Federal Deposit Ins. Corp.,* ___ U.S. ___, 108 S.Ct. 396, ___ L.Ed.2d ___ (U.S.1987).