HOFER, Appellant v. BON HOMME HUTTERIAN BRETHREN, INC., Respondent

(109 N.W.2d 258)

(File No. 9894. Opinion filed May 24, 1961)

J. H. Lammers, Madison, for Plaintiff and Appellant.

H. L. Bleeker, Alexandria, M. T. Woods, Sioux Falls, for Defendant and Respondent.

HANSON, J. This is an action to recover the reasonable value of personal services under an alleged implied contract. Verdict in the amount of $3,500 was returned in favor of plaintiff. Thereafter defendant's motion for judgment notwithstanding the verdict was granted by the trial court and plaintiff appeals.

The complaint alleges that from September 10, 1947 to May 10, 1959 the plaintiff, Jacob J. Hofer, performed work, labor, and services for the defendant, Bon Homme Hutterian Brethren, Inc., at its request, which services were reasonably worth $200 per month, or a total of $28,000, no part of which has been paid, although due demand was made therefor.

Defendant's position is that plaintiff performed his alleged work, labor, and services voluntarily and gratuitously, as one of its communal group, none of whom receives or expects wages or compensation. The answer alleges, in effect and in part, that defendant is a communal corporation organized for the purpose of engaging in the business of agriculture and for the purpose of providing a communal mode of living for the mutual benefit of

its members and their families; that its Articles of Incorporation and By-Laws and the Articles of Faith of the Hutterian Church require all members and their families to convey all property and to devote all their time, labor, services, earnings, and energy to the defendant commune and to live the communal form of life prescribed by the Hutterian Church. In return, every member is entitled to have his wife and children, who are not members, reside with him and be supported, maintained, instructed, and educated by the communal corporation as long as the member and his dependents, wife and children, shall abide by and conform to its Articles of Incorporation and By-Laws; and if plaintiff performed any work, or rendered any services he did so voluntarily as part of his family and communal obligation knowing he would receive no compensation; and plaintiff has received his board, clothing, keep, and all necessities of life with full knowledge of the facts and in full payment and satisfaction of his alleged claim against defendant.

■ ■ Plaintiff concedes there was no express agreement between the parties respecting his status, relationship, or employment. He also disclaims any right to recover under a so-called contract implied by law, or quasi contract, based upon the doctrine of unjust enrichment. He relies for recovery solely on the theory of a contract implied in fact. Plaintiff contends that where valuable services are rendered by one person for another, which are knowingly and voluntarily accepted, as the facts here will show, the law presumes, without more, that such services were given and received with the expectation of being paid for and will imply a promise to pay their reasonable worth. Ordinarily this is true, see 58 Am.Jur., Work and Labor, § 6, p. 514; 54 A.L.R. 548; 7 A.L.R.2d 12, and SDC 10.0324. However, as pointed out in the case of St. John's First Lutheran Church v. Storsteen, 77 S.D. 33, 84 N.W.2d 725, "the sweep of this rule is qualified by the circumstances existing between the parties" or, as more fully stated in 58 Am.Jur., Work and Labor, § 7, p. 515, "A

promise to pay for services rendered without an express contract as to compensation will not be implied in fact where there are no circumstances or conduct warranting the inference of such a promise or where the circumstances or conduct warrant a contrary inference. Such a promise is not implied where the person benefited has said or done nothing from which such a promise may be inferred, or where at the time they were rendered, it was intended, understood, or agreed that no payment should be made for them." The comment appearing under subsection 2 of section 107 Restatement of Restitution is to the same effect: "In the case of services, the inference of a promise to pay may be rebutted by the closeness of the relationship of the parties or by the fact that such services when rendered under like circumstances customarily are given without compensation".

■   We are required to view the evidence in a light most favorable to plaintiff. However, manifestations of intention here cannot be interpreted according to ordinary standards. Implications and inferences arising from conduct of these parties must be considered against a backdrop of communal life with its centuries old religious and secular concepts, customs, mores, usages, and practices. So viewed and interpreted the evidence will not sustain an implied promise to pay for the services rendered. Instead, the facts and circumstances warrant a contrary inference.

Plaintiff was no stranger to communal life. He was born at the Bon Homme Hutterite Colony in 1920. As one of ten children he resided at the Colony with his parents until he was twenty-two years of age. His father was an officer in the communal corporation and an elder in its church. Jacob was related by blood or marriage to over half the people in the Colony. The Colony maintained a "public" school through the elementary grades and also a "German" school. Jacob attended and completed both. At German school he was taught religion and the German language. Among other things he learned the Biblical base

of communal faith set forth in Acts 2:44, 45 wherein it is stated:

> "And all that believed were together, and had all things common;

> "And sold their possessions and goods, and parted them to all men, as every man had need."

Jacob left the Colony of his own volition in 1942. He earned enough money picking corn for farmers in the southeastern part of the state to take a six-week course in welding at Sioux City, Iowa. Upon completion he obtained employment as a welder in the Kaiser Shipyards at Portland, Oregon. He remained there four years and reached the status of a foreman. He then worked about a year at Seattle, Washington, for the Army Engineers after which he returned to Sioux City where he was employed by the Wilson Trailer Company. After working approximately eighteen months in Sioux City he returned to the Colony.

Jacob was twenty-eight years old when he returned in the fall of 1947. Apparently his first trip back was for the purpose of visiting his parents who were still living. He stayed only a few days. However, a week or so later he returned to the Colony and remained for twelve years. His claim is for services perfomed during the twelve-year period from 1947 to 1959.

The Colony has three leaders known and referred to as "bosses." The minister is head man and head boss, the treasurer is boss No. 2, and the farm boss is third in command. All are also ex officio elders in the church. When Jacob returned to the Colony the second time he indicated he would like to remain and wanted to stay. He told the minister "Here I am, what do you want me to do?" He was instructed to go to work under the supervision and direction of the farm boss. For a short time he worked in the shop as a welder, he then operated a tractor, and eventually he was put in charge of feeding the cattle. The welding, for the most part, was upon tractors and machinery that Jacob was using himself. This included a loader which he

constructed and used in his cattle feeding work. He refused to fix or weld things for others.

Jacob never made an application in writing, as required, for membership in the defendant corporation and never became a member. After his return he indicated a willingness to join but was told "you don't even wear suspenders" and to "come back later and wear suspenders". He did conform the first year or so to the rules and regulations of colony life. He atoned for his transgression of wandering from the Colony, according to custom, by standing up in church and receiving a lecture from the minister. From time to time he promised the elders he would "stick by the By-laws". However, after a few years Jacob started drifting away from the church and refused to regularly attend services. After 1954 he was frequently critical of colony life and told members they were crazy to work for nothing.

Jacob had a two-room apartment of his own in a large house in which his parents and several other families also lived. All took their meals in a common dining hall. In addition the Colony furnished clothing, laundry, and medical care. No person in the Colony ever received pay for his work. As the minister testified everyone was treated the same. With reference to Jacob he explained "what the other members get he gets * * * What I get, he gets." Despite this fundamental rule of communal life, Jacob never told anyone in authority he expected compensation for his services nor did he ever demand pay.

The only logical conclusion which can be drawn from the total facts is that when Jacob terminated his employment in Sioux City and returned to the Colony in 1947 he was returning home with intentions to resume communal life. The evidence is inconsistent with the idea he was merely changing jobs and expected his new employer, the Colony, to pay him a salary. Certainly the Colony entertained no such sacreligious and capitalistic notion. If later on Jacob grew dissatisfied with communal life and desired payment for his services, such uncommunicated

afterthought would not alter the legal relationship between the parties or impose liability on defendant. St. John's First Lutheran Church v. Storsteen, 77 S.D. 33, 84 N.W.2d 725, and see 58 Am. Jur., Work and Labor, § 8, p. 517.

Affirmed.

All the Judges concur.