Vincent **TRAMP,** Plaintiff and Appellee,

v.

Anthony **FOX,** Defendant and Appellant.

No. 16772.

Supreme Court of South Dakota.

Considered on Briefs March 20, 1990.

Decided May 30, 1990.

William J. Klimisch of Goetz, Hirsch & Klimisch, Yankton, for plaintiff and appellee.

Jerry L. Pollard of Kabeiseman, Hosmer & Kettering, Yankton, for defendant and appellant.

MILLER, Justice.

In this appeal, we affirm the trial court and hold that the bankruptcy code does not prohibit enforcement of an oral agreement between the parties.

## FACTS

In 1983, and prior, Vincent Tramp operated a business known as B.A. Tramp Oil Company. As part of that business, he was a dealer for Central Soya Feed. He ultimately became highly indebted to Central Soya.

That year, Tramp contemplated changing brands of feed and ceasing relations with Central Soya. Apparently another company wanted him to handle their product. Before Tramp had a chance to change brands, Anthony Fox, the district sales manager for Central Soya, approached him suggesting an alternative to changing feed brands whereby Tramp could also extinguish his debt with Central Soya. An oral agreement was reached by the two parties.[1] The original oral agreement generally was:

1. Fox would buy the "good" feed inventory from Tramp (apparently there was a certain amount of the inventory which was spoiled);

2. Fox would hire Tramp's salesman, Dan Ekeren, who would receive 50% of net sales;

3. Fox would retain 20% of net sales and would pay Tramp 30% of net sales;

4. Tramp would be a public relations representative for Fox' feed business; and,

5. Tramp would furnish a storage facility for the feed.

Tramp testified that he was later approached by Central Soya regarding his past-due indebtedness. Initially, he agreed to pay them $500 per month on the debt. Later, he agreed to pay them the thirty percent commission which he was to receive from Fox.

Later that same year (1983), Fox changed the name of the dealership to South Yankton Feed. He felt that such a change was necessary to separate the continued operation from Tramp's name as much as possible because of the varied amount of indebtedness that was associated with Tramp and his business.

---

1. Fox was acting on his own in this venture. Central Soya was not a party to the agreement.

In the fall of 1983, Tramp sold the building where the feed was being stored to a Mr. Gibson and then rented the storage space back at $250 per month. Fox testified that he was not aware that Tramp no longer owned this building until some time in the late spring of 1984. Fox then began paying rent directly to Gibson.[2]

Later, when Fox learned that Tramp was not making payments to Central Soya on his prior indebtedness, he made the commission checks payable jointly to Central Soya and Tramp.

In August 1984, Tramp filed for bankruptcy. In September, 1984, Tramp visited with Fox about their prior verbal agreement. He informed Fox of the bankruptcy and told Fox that he, Fox, would probably no longer have to live up to the agreement. Tramp testified that Fox advised that he wanted to continue the arrangement exactly as it had been before. Tramp agreed and stated that he would continue to furnish a place for storing the Central Soya product and to do public relations work and promotion of the sales by Fox. Fox does not specifically recall this conversation.

Tramp testified that about Christmas time, 1984, he had not received any further commission checks from Fox. He confronted Fox. Tramp contends that Fox informed him that he had been paying Tramp's commission directly to Central Soya. Tramp told Fox to cease that practice since, in view of the bankruptcy, the Central Soya debt was extinguished. Central Soya contacted Fox advising the same. Tramp indicates that into the spring of 1985 he was still not receiving any commission checks. Through a contact with Central Soya he learned that Fox had not made any payments to them.

Tramp made various personal demands upon Fox for payment. On one occasion, in the spring of 1985, he and his wife (they are now divorced) met with Fox seeking a specific accounting of the commissions owed. Fox stated that he forgot his books

and would get together with them at a later date. He never did.

Fox apparently took the position that as of August, 1984 (when Tramp went into bankruptcy), the arrangement had terminated. He asserts that Tramp ceased doing any sales or promotion work for him.

This action was commenced by Tramp filing a summons and complaint, alleging that Fox was indebted to him for commissions on net sales from September, 1984 into 1985, *all accruing after the bankruptcy was commenced.* Fox answered, denying any indebtedness and asserting that the agreement had been dissolved because of Tramp's failure to reveal the agreement to the bankruptcy court. Fox also counterclaimed, alleging that Tramp owed him for monies advanced to Tramp for the purchase of feed inventory. Tramp made a general denial to this counterclaim. (After the completion of discovery, Fox' attorney withdrew due to possible conflicts of interest. His present attorney represented him throughout the remainder of the action, including this appeal.) Subsequently, Fox filed a motion for summary judgment, claiming that, as a matter of law, the agreement between the parties had been dissolved by the bankruptcy action. The motion was denied. The action was then tried to the court which entered its judgment in favor of Tramp. It is from that judgment and the court's denial of summary judgment that this appeal was taken.

## DECISION

### ISSUE

WHETHER THE BANKRUPTCY CODE PREVENTS ENFORCEMENT OF THE AGREEMENT BETWEEN THE PARTIES.

Fox' brief has listed the following issues on appeal (he then argues them as one issue) which we have merged into the one issue stated above:

---

**2.** Originally, Tramp was paying the rent out of his commission. Fox had contacted Gibson and asked if he could pay him directly. Gibson later called Tramp and informed him of this arrangement. Fox contends that Gibson contacted him. Apparently, Fox felt that Tramp's renting, rather than owning, the storage facility constituted a breach of their agreement.

1. An agreement for a party to provide a building, supply customer base (goodwill) and perform "PR" is not just a contract for personal services.

2. Payments for rents, supplying a customer base (goodwill), "PR" without performing actual personal services does not qualify as earnings and exempt the property from the bankruptcy estate under 11 U.S.C. § 541(a)(6).

3. A contract should not be severed eliminating certain obligations without corresponding modifications of the consideration.

4. Public policy dictates that a bankrupt party should not benefit from a contract that they failed to disclose to the bankruptcy court when, if the contract is disclosed, the creditors, rather than the debtor, could benefit from the contract.

5. A lessee loses the right to sublease property when they file bankruptcy and fail to assume the release under 11 U.S.C. § 365(d)(1) and the lease is deemed rejected.

6. An agreement for a rental of a building providing customer list (goodwill) and for providing "PR" requires an assumption under 11 U.S.C. § 365(d)(1) (1978) to remain a valid agreement.

■ Although not specifically argued as such, we interpret this appeal to be a challenge to the trial court's findings of fact. Our scope of review in such a case is whether the trial court clearly erred; are the findings supported by the evidence? *Rosebud Sioux Tribe v. Strain*, 432 N.W.2d 259 (S.D.1988); *Smith v. Sponheim*, 399 N.W.2d 899 (S.D.1987); *Skoglund v. Staab*, 312 N.W.2d 29 (S.D.1981).

■ Fox argues that the trial court erred in excluding as a "service" the "public relations" Tramp agreed to perform.

However, under 11 U.S.C. § 541(a)(6)[3] such "services" do not become property of the estate in bankruptcy when performed *after* the commencement of the bankruptcy. An executory contract, as Fox concedes existed with Tramp, is in essence a personal services contract which is excluded from the bankruptcy estate pursuant to 11 U.S.C. § 541(a)(6). *In re Bofill*, 25 B.R. 550 (SDNY 1982). Such contracts are based on the personal skill of the debtor. *Matter of Noonan*, 17 B.R. 793 (SDNY 1982). By definition, and indirect concession by Fox, the public relations performed by Tramp was properly deemed to be a "service" by the trial court.

It is important to reiterate that the services performed by Tramp occurred after the commencement of the bankruptcy action. The prior agreement between the parties was essentially renewed by their agreement and conduct subsequent to the filing of the bankruptcy petition. Therefore, whether the original oral agreement was disclosed to the bankruptcy court is immaterial.

Therefore, under the specific issues raised by Fox, the trial court's ruling was correct. Additionally, although not specifically challenged by Fox, we determine that the trial court's findings are not clearly erroneous and it did not err in its conclusions of law. *Permann v. Dept. of Labor*, 411 N.W.2d 113 (S.D.1987).

Affirmed.

All the Justices concur.

---

**3.** 11 U.S.C. § 541(a)(6) provides:
(a) The commencement of a case under section 301, 302, or 303 of this title ... creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:

(6) Proceeds, product, offspring, rents, or profits of or from property of the estate, *except* such as are earnings from *services* performed by an individual debtor after the commencement of the case. (Emphasis added.)