**ARNOLD MURRAY CONSTRUCTION,**
**Plaintiff and Appellee,**

v.

**Billie Jo WITTROCK, Defendant**
**and Appellant.**

**No. 17652.**

Supreme Court of South Dakota.

Considered on Briefs April 22, 1992.

Decided July 15, 1992.

Douglas P. Cummings, Cummings Legal Clinic, Sioux Falls, for plaintiff and appellee.

Bill Froke and Matthew R. Metzgar, East River Legal Services, Sioux Falls, for defendant and appellant.

AMUNDSON, Justice.

Billie Jo Wittrock (Wittrock) appeals from trial court's judgment in favor of

Arnold Murray Construction (Company). We reverse and remand.

## FACTS

In 1979, Company built an apartment complex in Sioux Falls, South Dakota, known as "Eagles Nest." Bonnie Murray is the property manager for Eagles Nest, and is a general partner in Company. The Eagles Nest project was financed with a low-interest loan through the United States Department of Housing and Urban Development (HUD). In return for the low-interest financing and federally subsidized rent guarantees Company received from HUD, Company dedicated nine Eagles Nest apartments for federally subsidized housing tenants under HUD's Section 8 New Construction program.

HUD contracted with Sioux Falls Housing and Redevelopment Authority (SFH) to administer the Section 8 New Construction project at Eagles Nest. This contractual arrangement delegated certain administrative functions to SFH which would otherwise have been performed by HUD.

In August, 1988, Company began leasing one of the subsidized Eagles Nest apartments to Wittrock and her three small children. Wittrock signed a lease which had been prepared by Company's attorney sometime in 1984. The lease set the apartment rent in accordance with the Section 8 New Construction rules, allocating the amount which HUD would pay to Company through SFH, and the amount Wittrock would pay. In June of 1991, the amount Wittrock paid Company for her three-bedroom apartment was $33 per month, while HUD paid $457 per month, for a total monthly rent of $490.

Company's lease with Wittrock also required her to pay a mandatory monthly garage charge of $80 per month and a mandatory monthly cable television charge, which in 1988 was $11 per month but increased to $14 per month by June of 1991. Thus, Wittrock was actually paying approximately $125 per month in addition to HUD's $457 per month payment, for a monthly total lease payment of $582. Wittrock's sole source of income was Aid to Families with Dependent Children (AFDC) in the amount of $330 per month. On at least one occasion, Wittrock inquired of Company if she could be released from the garage and cable payments. Company refused to release Wittrock from those obligations.

In February, 1991, Wittrock had some repairs done to her apartment by Company, which billed Wittrock $136.87 for the repair work. After deducting a credit balance from an account which Wittrock had previously overpaid, and adding interest charges, the balance due on the repairs as of June, 1991, was $111.59. Wittrock paid $111.59 which she argues was intended for rent. Company applied the payment to the repair work and then demanded rent payment, which Wittrock subsequently failed to pay.

On June 11, 1991, Company served Wittrock with a ten-day notice to quit, and a summons and complaint on June 21, 1991. Wittrock served an answer and counterclaim and trial was set for August, 1991. Wittrock did not make any further payments on the garage after this action commenced, but did continue to pay for the cable television and her monthly apartment rent.

Prior to trial, Company filed a disciplinary complaint with the South Dakota Bar Association against Wittrock's attorney, alleging he was incompetent in housing law litigation. Notwithstanding this frivolous action by Company, the court trial was held as scheduled on August 14, 1991. After hearing the witnesses, reviewing the exhibits, and considering arguments of counsel, the trial court entered a decision from the bench which granted immediate possession of the premises to Company. Trial court entered its formal findings, conclusions, and judgment on August 26, 1991. Wittrock filed her notice of appeal on August 27, 1991, and then filed a motion with this court on the same day, requesting a stay of trial court's judgment. On August 30, 1991, this court entered an order granting the stay and directed Wittrock to comply with certain specific conditions. Wittrock complied with the conditions and, on Sep-

tember 13, this court entered an order approving form of compliance. As a result of our orders, trial court's judgment was stayed and Wittrock remains in tenancy. We turn now to the merits of Wittrock's appeal.

### ISSUES

(1) Whether trial court erred when it determined Company's lease complies with HUD regulations?

(2) Whether trial court erred when it allowed Company to evict Wittrock for nonpayment of rent?

### STANDARD OF REVIEW

It is well settled in this jurisdiction that, on review by this court, findings of fact will not be set aside unless they are clearly erroneous, and due regard will be given to the trial court to judge credibility of witnesses. *State By and Through DOT v. Garvin*, 456 N.W.2d 779 (S.D.1990). In applying this standard, we will not overturn the trial court's decision unless, after reviewing all evidence, we are left with a definite and firm conviction that a mistake has been made. *Bachand v. Walker*, 455 N.W.2d 851 (S.D.1990); *Smith v. Sponheim*, 399 N.W.2d 899 (S.D.1987). To determine whether trial court erred in its findings of fact, we look to whether the findings are supported by the evidence. *Tramp v. Fox*, 456 N.W.2d 554 (S.D.1990). We now turn to the merits of Wittrock's appeal.

#### (1) *HUD Regulations*

Wittrock argues that the mandatory monthly charges for cable television and garage are categorical violations of HUD's Section 8 New Construction program, and HUD had never authorized the charges. Trial court found that Company had proven by a preponderance of the evidence that it had complied with the federal regulations regarding Wittrock's lease and received the necessary approval. Trial court's specific finding regarding this issue is as follows:

> Defendant's income was such that she was eligible for subsidized housing through the Department of Housing and

Urban Development. Therefore, the lease agreement signed by the Defendant in this matter was approved by the Department of Housing and Urban Development and by Sioux Falls Housing and Redevelopment Commission.

We therefore look to the record to determine whether the evidence supports this finding. *Tramp, supra.*

■ Company argues that the form of the lease it used contained the garage and cable charges and was approved by HUD, thus, it complied with federal regulations. The HUD Handbook sets out various administrative requirements to ensure conformity with federal law. The HUD Handbook specifically states:

> "Fees for parking spaces, connection to a community television antenna, and other services *must be optional,* and the *type and amount* of the fee *must be approved in writing* by HUD." (Emphasis added.) HUD Handbook 4350.3, page 4–6, ¶ 4–12.

The evidence presented at trial reflects that the lease as drafted in 1984 was approved by HUD. This lease was merely a form lease and thus contained many blanks where specifics were filled in later. While this lease contained a blank for "Parking," no amount was reflected for the monthly parking charge. Thus, Company added the $80 per month garage charge and the $14 monthly cable charge sometime after 1984, and there was no evidence in the record disclosing a written approval from HUD or SFH of the garage or cable television charges contained in the lease.

The record is nebulous as to whether approval of the lease had to come from HUD or SFH through its contractual arrangement with HUD. A witness from Sioux Falls Housing and the attorney who drafted the lease both testified that, while they believed written approval was given, neither of them had any record of such approval from *either HUD or SFH* in their files. Further, the record contains a June 26, 1991, letter from a HUD section chief asking specifically that SFH: "Please ensure that the owner/manager [of Eagles

Nest] revises the lease to conform with the model lease.... Any reference to garage charge or garage rental *must* be optional, not mandatory." (Emphasis in original.) Thus, since HUD informed SFH that the lease was not in compliance with its regulations, it can logically be concluded that HUD did not approve this mandatory charge in Company's lease. It is also clear from a review of the lease that the charges were mandatory, not optional, and therefore in direct violation of HUD rules. Accordingly, in our view, the evidence does not tend to support trial court's finding that the lease was approved and is, therefore, clearly erroneous. *Tramp, supra; Bachand, supra.*

■ Even in the unlikely event the lease was approved, we conclude the additional charges in the lease violate federal law and are therefore void. When Congress passed the United States Housing Act of 1937, it specifically limited the tenant's contribution to monthly rent as follows:

Except as provided in paragraph (2), a family shall pay as rent for a dwelling unit assisted under this Act (other than a family assisted under section 8(*o*) [42 USCS § 1437f(*o*)]) the highest of the following amounts, rounded to the nearest dollar:

(A) 30 per centum of the family's monthly adjusted income;

(B) 10 per centum of the family's monthly income; or

(C) if the family is receiving payments for welfare assistance from a public agency and a part of such payments, adjusted in accordance with the family's actual housing costs, is specifically designated by such agency to meet the family's housing costs, the portion of such payments which is so designated.

42 U.S.C.A. § 1437a(a)(1). While Congress failed to specifically define what constitutes "rent," HUD provides its own definition for "Fair Market Rents" to assist in its rent determinations in various housing market areas. HUD defines "Fair Market Rent" as follows:

HUD's determination of the rents, *including utilities* (except telephone), ranges and refrigerators, *parking,* and all maintenance, management and other essential housing services, which would be required to obtain, in a particular market area, privately developed and owned, newly constructed rental housing of modest design with suitable amenities. (Emphasis added.)

24 CFR §§ 880.201, 880.203. Thus it is clear HUD's definition of "rent" is broad and would include charges such as the garage and cable charges, which Company imposed upon Wittrock in addition to her apartment rent.

Applying the federal statutes and regulations then, Wittrock's "rent" payment, as calculated by HUD, was accurate pursuant to 42 U.S.C.A. § 1437a(a)(1)(B); Ten percent of her monthly income ($330/month) for a rent payment of $33 per month. When considering the garage and cable television payments on top of the $33 per month *apartment* rent, Wittrock was actually paying roughly *38%* of her monthly income to live in Eagles Nest, which clearly violates 42 U.S.C.A. § 1437a(a)(1), and the federal regulations. Such a result is not justified by the evidence or the law.

Congress has declared it the policy of the United States "to promote the general welfare of the Nation by employing its funds and credit ... to assist the several States and their political subdivisions to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of lower income[.]" 42 U.S.C.A. § 1437. It is indeed unfortunate that some individuals would ignore this policy and place those who are least able to help themselves in a position to be taken advantage of. In light of the amount of federal support in this housing program and the clear policy underlying the law, we cannot deem it an appropriate judicial determination to evict this mother and her three small children onto the streets.

■ Wittrock additionally makes a claim for damages, claiming she should be repaid for all the illegal garage and television charges which Company forced her to pay. We conclude, however, that since Wittrock

used both the garage and cable television until June, 1991, she is not entitled to repayment for those charges. She accepted the benefit of these services, and is not entitled to receive them free of charge. *Ward v. Melby*, 82 S.D. 132, 142 N.W.2d 526 (1966); *Hofer v. Bon Homme Hutterian Brethren, Inc.*, 79 S.D. 150, 109 N.W.2d 258 (1961). In light of this conclusion, the trial court will not be required to review this damage claim on remand.

### (2) *Eviction for Nonpayment*

■ Wittrock was evicted for nonpayment of rent, although she made a payment which she argues was intended for rent and Company applied to repairs. There is no evidence in the record to enable us to determine whether the repairs were necessary due to "ordinary wear and tear" or resulted from Wittrock's damaging the apartment and, therefore, which party is responsible under the lease for these repair charges. Further, there is no evidence in the record to support the amount Company charged Wittrock for these repairs. Thus, we are unable to determine at the present time, whether or not Wittrock has defaulted on her $33/month payment. We therefore instruct trial court on remand to ascertain the amount due and nature of the repairs to establish whether the charges were reasonable. Should trial court determine Wittrock is responsible for these repair costs, it should allow Wittrock a reasonable time to pay.

This decision is reversed and remanded for further proceedings consistent with this opinion.

MILLER, C.J., and WUEST and SABERS, JJ., concur.

HENDERSON, J., concurs specially.

HENDERSON, Justice (specially concurring).

With the entirety of this opinion I agree, except for the penultimate sentence reading "Should trial court determine Wittrock is responsible for these repair costs, it should allow Wittrock a reasonable time to pay."

In my opinion, this otherwise excellent opinion is marred by that verbiage.

First, it is an anticipatory ruling by this Court.

Secondly, this case sounds in law, not equity.

Third, our direction invades the province of the trial court.

Fourth, and lastly, it is unnecessary in light of the express provisions of SDCL 15-6-62(a) which governs execution upon judgment or default judgment providing, inter alia, an automatic stay of execution for 30 days "or as otherwise ordered for good cause." We are poking our nose into the trial court's business and we should stay at home.