FIRST NATIONAL BANK OF BERESFORD, Plaintiff and Appellant,

v.

Elden NELSON, Defendant,

and

ERD, Inc., a Corporation, Defendant and Appellee.

No. 13410.

Supreme Court of South Dakota.

Argued Nov. 20, 1981.

Decided Sept. 1, 1982.

consider. SDCL 25–4–45.1; see generally, footnote 2, supra.

Gale Fisher, Sioux Falls, for plaintiff and appellant.

John E. Burke, Sioux Falls, for defendant and appellee.

WOLLMAN, Chief Justice.

Elden Nelson is a Union County farmer. He and his sons Robert and David are the sole stockholders, directors, and officers in ERD, a family farming corporation. Elden Nelson's son Elwood Nelson (Woody Nelson) had an interest in an insurance agency in Sioux Falls during all times material to this lawsuit.

In March of 1978, Woody Nelson was indebted to Bank in the sum of $111,000, the indebtedness being represented by four separate promissory notes. Because of Woody Nelson's failure to make timely payments on these notes, Bank refused his request for additional loans on the strength of his own signature. Bank was willing, however, to make a loan of $125,000 to Elden Nelson, conditioned upon his furnishing adequate collateral. Accordingly, on March 29, 1978, Elden, Robert, and David, acting in their capacity as the directors of ERD, adopted a corporate resolution authorizing ERD to execute a guaranty of payment of a loan made by Bank to Elden Nelson in the amount of $125,000, and signed such a guaranty. Elden Nelson signed a promissory note in favor of Bank in the amount of $125,000, payable in ten equal annual installments, commencing March 29, 1979, and bearing interest at nine percent. Elden Nelson deposited the proceeds of the note in his checking account and gave Woody Nelson a check in that amount. Woody Nelson cashed the check and gave Elden Nelson a promissory note for $125,000, which Elden Nelson endorsed to Bank as additional collateral for his note of March 29.

The text of the corporate resolution authorizing the execution of the guaranty reads as follows:

RESOLVED: That the President be and he is hereby authorized to make and execute a certain guarantee to the First National Bank of Beresford, Beresford, South Dakota, guaranteeing payment of a loan made by the said First National Bank of Beresford to Elden Nelson in the sum of $125,000.00 due in ten years and bearing interest at 9 per cent per annum. The President is further authorized to make and execute a mortgage in favor of the First National Bank of Beresford mortgaging the real property owned by the corporation as security for such guarantee.

The pertinent portions of the guaranty read as follows:

IN CONSIDERATION, That The First National Bank of Beresford, S. Dak (herein called the "Bank") has heretofore and may hereafter, from time to time,

discount notes for, loan money to and furnish other banking accommodation to Elden Nelson, (herein called the "Debtor"), the undersigned, in consideration of the premises and other good and valuable consideration, hereby absolutely and unconditionally guarantee to the Bank the full and prompt payment at maturity of any and all indebtedness, liability or obligation (herein called "Indebtedness") of whatsoever kind and nature now or hereafter (until this guaranty be revoked as herein provide (sic)) due and owing from the Debtor, his or its personal representative, successor or assigns, to the Bank, whether such Indebtedness be direct or indirect, absolute or contingent, joint or several and howsoever created, evidenced, owned, held or acquired and whether the Debtor be liable as maker, acceptor, drawer, endorser, guarantor, surety or otherwise . . . .

The undersigned waive presentment, demand, protest, notice to the undersigned and all other persons of protest and dishonor as to each and all items of Indebtedness and the collateral thereto; waive notice of the acceptance hereof by the Bank of the creation and existence of said Indebtedness waive any and all acts or things by the Bank to be done to establish the liability of the undersigned in the premises; *agree that no act or thing, except payment, which but for this provision might or could in law or in equity act as a release of the liabilities of the undersigned hereunder, shall in any way affect or impair this guaranty*; and agree that this shall be a continuing, absolute and unconditional guaranty and shall be in force and be binding upon the undersigned until the Indebtedness is fully paid and this guaranty is revoked as herein provided.

In addition to but not in limitation of the foregoing, the undersigned agree: *The liability hereunder shall in no wise be affected or impaired by* (and said Bank is hereby expressly authorized to make from time to time without notice to any one and either before or after revocation of this guaranty) *any* sale, pledge, surrender, compromise, settlement, release, *renewal, extension, indulgence, alteration, substitution, exchange, change in, modification or other disposition of the Indebtedness, any evidence thereof, or any security or collateral therefor*; by any acceptance by said Bank of security for or other guarantors of any Indebtedness . . . .

. . . .

The liability of the undersigned hereon shall not, at any time, exceed the sum of $125,000.00 One Hundred Twenty Five Thousand and all expenses hereinbefore mentioned but the liability hereon shall be released or affected if at any time the Indebtedness exceeds that amount and the Bank may apply all sums received by it from the Debtor, from collateral (in case of the death, insolvency or bankruptcy of the Debtor) from claims against Debtor's estate and from any other source, first, in payment of such excess (emphasis added).[1]

The guaranty was signed by Robert Nelson, Elden Nelson, and David Nelson in their respective capacities as president, vice-president, and secretary-treasurer of ERD. The guaranty bore the corporate seal.

In addition to the foregoing documents, ERD also executed a security agreement, dated March 1, 1978, granting Bank a security interest in:

All equipment, all farm products including but not limited to crops, livestock, supplies, used or produced in farming and feeding operations, feeds kept or stored in connection therewith, contract rights, accounts, and all proceeds; all now owned or hereinafter acquired.

In September of 1978 Elden Nelson gave Bank a promissory note in the amount of $23,000; in October of 1978 he gave Bank another promissory note in the sum of $27,000. These notes were consolidated into a

1. Although the guaranty is dated March 27, 1978, Robert Nelson, President of ERD, testified that it was signed on the same day the note was signed, March 29, 1978.

single $50,000 note on October 22, 1978, bearing a due date of December 15, 1978.

Woody Nelson made only nominal payments on his several promissory notes to the Bank, with the result that early in 1979 he had past due notes to the Bank in the amount of some $111,000. In addition, no payments had been made on the $50,000 note of October 22, 1978, executed by Elden Nelson.

On March 29, 1979, Woody Nelson, together with his certified public accountant, had a lengthy discussion with Robert Knopke, president of Bank. The parties finally reached an understanding whereby Woody Nelson agreed to pay Bank $141,-548.17 in payment of his delinquent notes. In addition, $11,280.82 of the payment was to be applied to the interest due on Elden Nelson's $125,000 note of March 29, 1978, and $52,056.16 was to be applied in payment of interest and principal on Elden Nelson's note of October 22, 1978.

As a part of this agreement, Knopke agreed to renew Elwood Nelson's $40,000 note and to renew Elden Nelson's March 29, 1978, $125,000 note. Both of these notes were to be renewed for a period of 120 days in order to give Woody Nelson and Elden Nelson time in which to refinance the obligations or to obtain other financing. A new note in the amount of $125,000 was prepared, bearing interest at the rate of ten and one-half percent and due in 120 days. The note was given to Woody Nelson, who took it to Elden Nelson's home, where the latter signed it.

Woody Nelson's check for $141,548.17 given pursuant to the March 29, 1979, agreement was returned to Bank unpaid bearing the notation "payment stopped." Following further negotiations between Knopke and Woody Nelson, a wire transfer was made by Woody Nelson's California bank to Bank in the amount of $141,548.17 in payment of the check on which payment had been stopped. The proceeds of the wire transfer were applied in accordance with the agreement reached by the parties on March 29, 1979.

Other than the $11,280.82 interest payment that was made on Elden Nelson's $125,000 note of March 29, 1978, no payments were made either on that note or on the renewal note of March 29, 1979, which forms the basis for this lawsuit.

Bank brought suit against Elden Nelson and ERD in September of 1979, seeking judgment against Elden Nelson for the face amount of the March 30, 1979, note, together with interest thereon, and judgment foreclosing Bank's security interest in the collateral described in the security agreement executed by ERD. Defendants' answer alleged that the March 30, 1979, note had been executed under duress and through Bank's fraud and deceit and that no consideration had been given for the note. Elden Nelson filed a counterclaim for compensatory and punitive damages allegedly sustained as a result of Bank's fraud and duress and the malicious and oppressive behavior of Knopke.

The trial court directed a verdict in favor of Bank on its complaint and permitted the issues raised by the counterclaim to go to the jury, which found in favor of Bank. Judgment was entered against Elden Nelson in the amount of $148,517.12, which represented the amount due and owing on the March 29, 1979, note. The judgment provided that of this amount, $125,000 should be a joint and several judgment between both defendants. The judgment further ordered that the property described in the security agreement be sold. Finally, the judgment denied Elden Nelson any recovery on his counterclaim.

On January 27, 1981, ERD filed a motion for judgment notwithstanding the verdict and, in the alternative, for a new trial. A hearing on the motion originally scheduled for February 9 was cancelled, and the trial court directed that the motion be submitted on briefs, ERD to file its brief on or before February 25, 1981, and Bank to file its brief on or before March 4, 1981. On March 17, 1981, the trial court entered judgment notwithstanding the verdict discharging ERD from all obligations under the January judgment and dismissing Bank's complaint with prejudice.

Bank's first contention on appeal is that the trial court was without jurisdiction to grant the judgment N.O.V. because the twenty-day time limitation provided by SDCL 15–6–50(b) had expired prior to March 17, 1981. We disagree.

At issue is the meaning of the words "presentation" and "making" in SDCL 15–6–50(b). This rule reads in part:

> Not later than ten days after notice of entry of judgment, a party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict .... A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative....
>
> The court shall make and file the order granting or denying such judgment notwithstanding verdict within twenty days after the presentation of such motion. If a motion for judgment notwithstanding verdict has not been determined by the court within twenty days from the date of making such motion, it shall be deemed denied.

In *Security State Bank v. Rodway*, 50 S.D. 156, 208 N.W. 778 (1926), the court interpreted statutory language [2] concerning the time for presenting a motion for new trial, and equated the term "presentation" with "hearing."

Consistent with our holding in *Security State Bank*, supra, that "presentation" means "hearing" is *McVay v. N. & L. Motor Sales*, 73 S.D. 497, 44 N.W.2d 609 (1950), in which the court held that the trial court had no jurisdiction to enter an order on a motion for a new trial when more than forty days had elapsed from the date of hearing the motion.[3] The court's decision in *Terrace Park Dairy v. Surface Engineering Co.*, 83 S.D. 294, 158 N.W.2d 685 (1968), is consistent with these holdings.

As noted by the court in *Terrace Park*, SDC 1960 Supp. 33.1608 provided that "If an application for new trial has not been determined by the Court within forty days from date of making such application, it shall be deemed denied." In contrast, SDC 1960 Supp. 33.1705, which governed the procedure for making a motion for judgment N.O.V., imposed no similar time limitation upon the action by the trial court on such a motion. That section was superseded by SDCL 15–6–50(b) when the new rules of civil procedure became effective on July 1, 1966. Again, no time limits were imposed upon the trial court with respect to taking action on a motion for judgment N.O.V. It was not until 1979 that SDCL 15–6–50(b) was amended (Supreme Court Rule 79–4) to require the trial court to either grant or deny such a motion within twenty days after presentation of the motion. The language imposing the time limitation was taken verbatim from the last paragraph of SDCL 15–6–59(b), as amended by the court in 1976. The purpose of the 1979 amendment was to bring Rule 50(b) into congruence with Rule 59(b) and with the last paragraph of SDCL 15–26A–6 (Supreme Court Rule 79–6), which provides:

2.  Rev.Code 1919, § 2559, as amended by Laws 1921, c. 185, now SDCL 15–6–59(b).

3.  At that time SDC 33.1608 and 33.1610, now incorporated into SDCL 15–6–59(b), provided:
    SDC 33.1608:
    If an application for new trial has not been determined by the Court within forty days from date of making such application, it shall be deemed denied.
    SDC 33.1610:

    . . . . .

    The Judge shall make and file the order granting or denying such new trial within forty days after the presentation of such motion or application.

SDCL 15–6–59(b) as amended by Supreme Court Rule 76–3 provides:
    The court shall make and file the order granting or denying such new trial within twenty days after the presentation of such motion. If a motion for new trial has not been determined by the court within twenty days from the date of making such motion, it shall be deemed denied.
(The 1976 amendment reduced the time for granting or denying a new trial from forty days to twenty days. That amendment also deleted the provision that allowed the trial court to extend the time for acts under § 15–6–59.)

The running of the time for filing a notice of appeal is terminated as to all parties by a timely motion filed in the circuit court by any party pursuant to § 15–6–59 or § 15–6–50(b), or both, and the full time for appeal fixed by this section commences to run and is to be computed from the attestation and filing of an order made pursuant to such motion or if the circuit court fails to take action on such motion within the time prescribed, then the date shall be computed from the date on which the time for action by the circuit court expires.

■■■ One of the principal purposes of our new appellate rules, which went into effect on July 1, 1979, was to reduce the time involved in the appellate process, including such intermediate steps as preparation of the trial transcript and the submission of appellate briefs. In retrospect, it may well have been advisable for the court to have eliminated the ambiguity created by the use of "presentation" and "making" in both Rule 50(b) and Rule 59(b) at the time the language of the last paragraph of Rule 59(b) was carried over into Rule 50(b). Be that as it may, however, we are faced with the holdings in the above-cited cases to the effect that the date on which the twenty-day time limitation begins to run is the day after a motion for judgment N.O.V. or for new trial is presented to the court, with "presentation" being equated with the date on which the motion is heard and considered. Accordingly, we conclude that the motion in the instant case was presented to the trial court on the date the last brief was due, March 4, 1981, and that the twenty-day period within which the trial court was required to act commenced to run on the following day.

We turn, then, to the merits of the trial court's action in entering judgment N.O.V. In granting the motion for judgment N.O.V., the trial court found that Bank had changed the terms of the March 29, 1978, promissory note without the authority and consent of ERD; that there was no corporate authority authorizing Elden Nelson to execute the March 29, 1979, renewal note

and thereby obligate ERD; and that ERD did not authorize, acquiesce in or ratify the March 29, 1979, renewal note. The court concluded from these findings that ERD should be released from its obligation under the guaranty and that the judgment earlier entered against ERD should be vacated and discharged.

ERD contends that the trial court's action in relieving it of any obligation created by the guaranty finds support in SDCL 56–1–22, which provides:

A guarantor is exonerated except so far as he may be indemnified by the principal if by any act of the creditor, without the consent of the guarantor, the original obligation of the principal is altered in any respect or the remedies or rights of the creditor against the principal in respect thereto in any way impaired or suspended.

ERD cites us to a decision of the Supreme Court of North Dakota that held that a renewal note that increased the principal indebtedness by some $1,800, which increased the monthly payments from $214.73 to $275.23, and which extended the payment period by some eleven months, altered the original obligation of the principal within the meaning of a statute identical to SDCL 56–1–22 and thereby exonerated and discharged the liability of the guarantor. *Liberty National Bank and Trust Co. v. Dvorak*, 199 N.W.2d 414 (N.D.1972). The *Dvorak* decision was followed in *AMF, Incorporated v. Fredericks*, 212 N.W.2d 834 (N.D. 1973).

■■ If we agreed with the trial court's finding that ERD had not authorized Bank to renew or alter the provisions of the instrument that constituted evidence of the $125,000 indebtedness that the corporate resolution of March 29, 1978, authorized ERD to guarantee, we might very well be inclined to agree with ERD that the views expressed by the Supreme Court of North Dakota in the above-cited cases should be adopted as controlling in this case. We conclude, however, that inasmuch as the guaranty itself, which beyond question went beyond the specific terms of the au-

thorizing resolution, was signed by all of the shareholders, directors, and officers of the corporation and bore the corporate seal, the corporation cannot now be heard to deny the validity of that instrument.

The technical rules commonly applied to public-issue corporations are not necessarily applied to close corporations similar to ERD. See generally 1 O'Neal, *Close Corporations* § 1.15 (2d ed. 1971). As stated by the Supreme Court of Pennsylvania, "a very small or closed corporation is not held to the strict formalities that are applicable to large corporations, especially where the members of the Board of Directors personally conduct and actively direct the business." *Chambers v. Beaver-Advance Corporation,* 392 Pa. 481, 140 A.2d 808, 814 (1958). This court many years ago recognized that there are situations in which the sole shareholders and directors of a corporation can legally bind the corporation even though the action taken may not have been authorized by corporate resolution. *American Nat. Bank v. Wheeler-Adams Auto Co.,* 31 S.D. 524, 141 N.W. 396 (1913). Although it is true that in that case the corporation and its stockholders were estopped to deny the validity of a mortgage that had been executed by the two stockholders who had assumed the exclusive control and management of the affairs of the corporation, the remaining shareholder having committed the affairs of the corporation to her shareholder-husband, the general principles set forth in that decision are applicable to the case at hand. Had only the president of ERD signed the guaranty, a closer question might be presented. Cf. *Citizens' Bank & Trust Co. v. McGaa,* 48 S.D. 45, 201 N.W. 873 (1924). As it was, however, all of the parties who could conceivably have been affected by the liability created by the guaranty joined in executing the instrument. That being the case, those persons should not now be heard to deny the validity of that instrument.

Once the validity of the guaranty is recognized, it follows from the terms of that instrument itself that ERD consented to alterations in the terms of the obligation of Elden Nelson to Bank. See *Chris Craft*

*Industries, Inc. v. Van Valkenberg,* 267 So.2d 642 (Fla.1972).

The judgment notwithstanding the verdict is reversed, and the case is remanded to the circuit court with directions to reinstate the jury verdict and the judgment entered thereon in favor of Bank against ERD.

All the Justices concur.