(855 P.2d 493)

No. 68,362

FIRST NATIONAL BANK OF ANTHONY, KANSAS, *Appellant/Cross-Appellee*, v. FLOYD RUSSELL DUNNING, JR., *et al.*, *Appellee*, and MINNIE I. DUNNING, *Appellee/Cross-Appellant*.

Opinion filed July 2, 1993.

*F. C. "Rick" Davis II*, of Bruce & Davis, of Wichita, for appellant/cross-appellee.

*Theodore C. Geisert*, of Geisert & Watkins, P.A., of Kingman, for appellees and cross-appellant.

Before GERNON, P.J., PIERRON, J., and PAUL E. MILLER, District Judge, assigned.

PIERRON, J.: The First National Bank of Anthony (Bank), plaintiff/appellant, appeals the trial court's decision in favor of Minnie I. Dunning, defendant/appellee. The court held Minnie was discharged from a surety agreement after the Bank and the principal, Floyd R. Dunning, Jr., modified the principal's contract without Minnie's consent. Minnie cross-appeals.

The main issue raised by appellant is whether the granting of an extension of time for two installment payments and increasing the rate of interest on the note modified the underlying agreement so as to discharge the surety.

On cross-appeal the appellee raises three issues:

Did the Bank unjustifiably. impair the collateral?

Was there an express requirement that Mrs. Dunning sign the note before the mortgage could be given effect?

Did the Bank's actions violate the Kansas Consumer Protection Act?

The facts are as follows: Floyd was indebted to the Bank. In an effort to help Floyd stay in business, the Bank agreed to restructure Floyd's debt and loan him an additional $65,000. This agreement was reached in August 1987.

The note was to be amortized over 20 years and paid in 9 equal installments, commencing August 1988, and a 10th payment, which was to be a balloon payment. Interest was set at $11\frac{1}{4}\%$. Future rates were to be adjusted yearly and indexed to the Bank's base rate, and Floyd's rate would always be $\frac{1}{2}\%$ below the base rate.

As part of this agreement, the Bank required Floyd to present additional collateral. Floyd agreed, and his mother, Minnie, executed a mortgage to a quarter section of land. Minnie owned $\frac{11}{12}$ of the section. Floyd owned the other $\frac{1}{12}$. Floyd signed the note and mortgage at the Bank. Floyd requested that Minnie be allowed to sign at her home. The Bank agreed, and a notary public accompanied Floyd to Minnie's where her signature was obtained on the mortgage. It is uncontroverted that no Bank representative spoke with Minnie about the obligation she was assuming or about Floyd's precarious financial situation. At the time of restructuring, Floyd's financial statement showed a negative net worth of $119,531. He owed the Bank $451,000. Floyd was also indebted to the Federal Land Bank.

Floyd fell behind on his payments, and in January 1989 the Bank and Floyd executed a modification. The due date for the August 1988 payment was extended to April 1989. In addition, the interest rate was increased to 12.25%, variable as in the original agreement.

In September 1989, Floyd and the Bank entered into another extension agreement, extending the time for the August 1989 payment to October 31, 1989. When Floyd failed to make that payment, the Bank accelerated the note, sold Floyd's collateral, and foreclosed on the mortgage.

In a letter opinion issued after a bench trial, the district court held Minnie was discharged as surety because the time to make

two payments was extended. The judge specifically held the increase in interest was not a modification which would discharge Minnie because "they followed the same interest rate formula set forth in the original note."

Minnie was a gratuitous surety because she was not compensated. A gratuitous surety is a "favorite of the law." See Stearns, The Law of Suretyship § 2.4 (Elder ed. 1951), and Simpson, Handbook on the Law of Suretyship § 29 (1950).

The preferential status accorded a gratuitous surety has been adopted by the Kansas Supreme Court. *Fisher v. Pendleton,* 184 Kan. 322, 327, 336 P.2d 472 (1959); *Scovill v. Scovill,* 144 Kan. 759, 761, 62 P.2d 852 (1936).

This rule of *strictissimi juris* is now generally interpreted as meaning that the contract be read to ascertain the intentions of the parties as expressed in the contract and that the surety's obligation be neither extended nor reduced by judicial construction. Simpson, § 29.

The obligation underlying a surety agreement cannot be modified without the surety's assent. A modification which alters the surety's obligation will discharge the surety. However, the alteration must be a material change. See Simpson, § 72; Stearns, § 6.3; *Fassett v. Deschutes Enterprises,* 69 Or. App. 426, 431-32, 686 P.2d 1034 (1984).

In this case, the parties and the trial court focus on the extension of time to make two installment payments. There is a line of Kansas cases which holds that a surety is discharged when the time to pay a debt is extended. *Fisher v. Spillman,* 85 Kan. 552, 554, 118 Pac. 65 (1911); *Bank v. Brooks,* 64 Kan. 285, Syl., 67 Pac. 860 (1902); *Stove Works v. Caswell,* 48 Kan. 689, Syl., 29 Pac. 1072 (1892). Both sides point out that the specific question involved here, discharging a surety by granting an extension of time to make *installment* payments, as opposed to paying the whole debt, has not been considered by the Kansas appellate courts.

The "material modification of terms" doctrine is extensively discussed in treatises. However, relatively few Kansas cases have been decided using this theory. The Court of Appeals enunciated the standard in *Plow Co. v. Ward,* 1 Kan. App. 6, 41 Pac. 64 (1895). In that case, the surety was discharged because a three-

year payment plan was modified to require payment of the entire debt within one year.

The material modification doctrine has been applied in other contexts in cases decided by the Kansas appellate courts. See *McLennan v. Wellington,* 48 Kan. 756, 30 Pac. 183 (1892) (sureties on contractor's bond were not released by alteration of building plan where owner reserved that right); *State v. Indemnity Ins. Co. of N. Amer.,* 9 Kan. App. 2d 53, 672 P.2d 251 (1983) (applying doctrine to surety on bail bond), *rev. denied* 234 Kan. 1077 (1984). To find cases analogous to the one under consideration, it is necessary to look to other jurisdictions.

The "material change" standard has been applied in other jurisdictions. See *Gebrueder Heidemann, K.G. v. A.M.R. Corp.,* 113 Idaho 510, 746 P.2d 579 (Ct. App. 1987); *Black Bull Enterprises, Inc. v. Hall,* 107 Or. App. 754, 813 P.2d 571 (1991); *Fassett,* 69 Or. App. 426; and cases cited therein. This rule is also set out in Restatement of Security § 128 (1941), which provides:

> "Where, without the surety's consent, the principal and the creditor modify their contract otherwise than by extension of time of payment
>
> .(a) the surety, other than a compensated surety, is discharged unless the modification is of a sort that can only be beneficial to the surety."

This standard is also discussed in Stearns, The Law of Suretyship § 6.3. Stearns states that a change is material when the nature of the contract is changed. This can happen when new obligations are imposed or when prior obligations are taken away. The ultimate question is whether "[t]he effect of the change is to place the surety in a different position than he occupied before the change was made." Stearns, § 6.3, p. 109.

Material change has also been defined as a change that a careful and prudent person would regard as substantially increasing the risk of loss. *Black Bull Enterprises, Inc.,* 107 Or. App. 734, Syl. ¶ 1.

Research has not revealed a case which presents facts similar to those in the case before the court. At the time of the mortgage, Floyd had a negative net worth and a negative cash flow. He was already deeply in debt at the time the Bank made the loan for which Minnie served as surety. Floyd could not make the first payment so the Bank allowed a modification. The Bank was

depending on projected receipts from year two of the note to make the payments due for both years. However, it appears there were only enough funds from the second year's receipts to pay for the first year. Consequently, Floyd was unable to make the payments for the second year.

Stearns notes that a change in the rate of interest is material. Stearns, § 6.4. The trial court held the interest rate change in this case was not relevant because the rate was increased in accordance with the contract terms. The court was correct. The change in interest rates had been anticipated in the contract and did not constitute a material modification in the surety agreement.

Appellant claims the Bank's forebearance on the first installment payment was also a material modification. However, it is difficult to see how the modification to the agreement prejudiced Minnie. The term of the debt was neither extended nor shortened. The interest rates under the agreement were not changed. The only real change was to give Floyd some flexibility in repaying the loan during the term. Had this not been done, the Bank could have foreclosed sooner. Absent some showing of prejudice, we cannot see how the modification was material from Minnie's standpoint.

It was, therefore, error for the trial court to find that there had been a material modification to the surety agreement which justified releasing the surety, and we reverse on that ground.

Concerning the issues in the cross-appeal, we first address the issue of whether the plaintiff unjustifiably impaired the collateral.

This issue was not considered by the trial court because it held Minnie was discharged by the modifications. We find there was no impairment of collateral. The collateral in question relates to life insurance policies on Floyd. As we understand the record, Floyd assigned, as additional collateral, policies on his life which had face values of large amounts.

However, as soon as the assignment was made, Floyd apparently stopped making payments on the premiums and they lapsed. No evidence was presented purporting to show the Bank agreed to maintain the policies. Floyd did not die. Appellee's argument that accepting assignment of any possible benefits from life insurance policies somehow obligated the Bank to maintain the policies is unsupported by any applicable authority.

The second issue in the cross-appeal is whether there was an express requirement that Minnie sign the note before the mortgage could be given effect.

The mortgage language in question is as follows:

"In consideration of the sum ($65,000.00) . . . , the receipt of which is hereby acknowledged, first party [Floyd R. Dunning, Jr., and Minnie I. Dunning] hereby mortgages and warrants unto second party [First National Bank of Anthony, Kansas] his/its heirs, successors and assigns, all the following described Real Estate situated in Kingman County, Kansas, to-wit:
  "[real property described]
  . . . .
  "PROVIDED, ALWAYS, That these presents are upon *this express condition, that whereas,* first party has this day executed and delivered a certain promissory note in writing to second party."

We find the trial court's ruling on this issue in its letter opinion of March 11, 1992, to be persuasive:

"[T]he Court would cite the Kansas case of *McMurray v. Crawford,* [3 Kan. App. 2d 329, 594 P.2d 1109 (1979)], which stands for the proposition that 'one who joins in the execution of a real estate mortgage as security for a note cannot defeat foreclosure merely because he did not also sign the note.' (Syllabus 1)
  "Based on Finding of Fact 13, there was nothing incomplete, confusing, fraudulent or legally inappropriate with the language of the mortgage which the Defendant Minnie I. Dunning signed. Defendant Minnie I. Dunning had knowledge of all of the *necessary* facts regarding the nature and extent of her mortgage obligation to the Plaintiff bank *before* she signed the mortgage. (See also *First National Bank & Trust Co. v. Lygrisse,* 231 Kan. 595, 647 P.2d 1268 [1982], at pp. 600-601.) If she had any questions about the documents she signed or the nature and extent of her obligation to Plaintiff bank she kept them to herself. She certainly had a legal obligation to read the document and make inquiry about its contents before signing it.
  "Finally, the Court notes that 'in order to create a mortgage contract, no particular form of instrument is necessary and no particular words are required . . . if the purpose plainly appears. All that is necessary is that there be a debt and that the instrument creates a lien on real property as security for payment of the debt'. (*Garnett State Savings Bank v. Tush,* 232 Kan. 447, 657 P.2d 508 [1983], at Syllabus 1.) The instrument which Defendant Minnie I. Dunning signed described a debt and created a lien on her real property as security for payment of that debt. No additional information was legally necessary under the specific facts of this case. *She obviously was not concerned about the specifics of the transaction. She signed the paper voluntarily so her son could stay in business.*"

The final issue to be resolved is whether the Bank's actions violated the Kansas Consumer Protection Act (KCPA), K.S.A. 50-623 *et seq.*

The trial court held that Minnie was a consumer as defined by the KCPA and that the transaction was a consumer transaction as described by the Act. The court also found, based on the facts adduced at trial, that the Bank did not violate the KCPA. This claim is relevant because, if there was a violation of the KCPA, Minnie may be entitled to a penalty and attorney fees. See K.S.A. 1992 Supp. 50-634(b) and (e).

The Act protects an "individual or sole proprietor who seeks or acquires property or services for personal, family, household, business or agricultural purposes." K.S.A. 1992 Supp. 50-624(b).

The Bank argues the court erred by holding Minnie was a consumer, because Minnie did not seek or acquire property.

No cases which address this issue have come to light. However, an analysis of recent cases where the KCPA was applied reveals the Act was applied only to the parties to the contract. See *Farrell v. General Motors Corp.*, 249 Kan. 231, 815 P.2d 538 (1991); *Stair v. Gaylord*, 232 Kan. 765, 659 P.2d 178 (1983); *Heller v. Martin*, 14 Kan. App. 2d 48, 782 P.2d 1241 (1989). To hold Minnie was covered by the KCPA would be to extend the KCPA to third parties.

The trial court states: "It is inconceivable to the Court that the Act would not likewise apply to the gratuitous mortgagor of real estate in support of Defendant." It would seem though, that without entering into or benefiting from the loan contract, Minnie cannot be a consumer under the Act. Therefore, the court's holding is reversed.

Reversed.