**FIRST DAKOTA NATIONAL BANK,**
Plaintiff and Appellant,

v.

**William MAXON and John T. Parker,**
**Jr., Defendants and Appellees,**

and

**Jack Schaefer, Defendant.**

No. 18558.

Supreme Court of South Dakota.

Considered on Briefs Oct. 17, 1994.

Reassigned Feb. 1, 1995.

Decided June 21, 1995.

Michael F. Marlow and Robert C. Brown of Johnson, Heidepriem, Miner & Marlow, Yankton, for plaintiff and appellant.

Gale E. Fisher, Sioux Falls, for appellee, Maxon.

John A. Schlimgen of Stuart and Gerry, Sioux Falls, for appellee, Parker.

KONENKAMP, Justice.

First Dakota National Bank appeals the circuit court's judgment discharging persons on a promissory note. We reverse.

## FACTS

William Maxon owned the Skyline Motel and Chateau Lounge located in Yankton, South Dakota. He sold it in September 1987 on a contract for deed to J & J Hotels, Inc. (J & J), a corporation formed by Jack Schaefer and John Parker. Under the terms of the sale contract, J & J assumed Maxon's remaining unpaid obligation on his contract for deed on the property and agreed to pay Maxon a down payment of $100,000. J & J borrowed $50,000 from First Dakota National Bank from which it paid Maxon only $25,-000 on the down payment. The balance of $75,000 was due Maxon January 1, 1988, but Schaefer and Parker were unable to borrow

it. So Maxon, Schaefer and Parker attempted to arrive at an arrangement whereby in lieu of the remaining cash down payment, Schaefer and Parker would take over Maxon's debt to his lender, American State Bank, on a wholly separate note Maxon made.

Maxon first approached American State with the express purpose of having it loan Schaefer and Parker new money to pay off Maxon's note. He testified at trial that American State's president responded, "I will not loan them the money unless you guarantee it." In Maxon's deposition, which he was confronted with at trial and which he agreed was accurate, Maxon testified the president said, "I will not loan Jack Schaefer and John Parker that money unless you co-sign it." Maxon explained that "co-signing would I guess mean I would be a co-maker of the note and guarantor would be just that." In response to a question from his attorney Maxon admitted he sometimes used "guarantor" and "co-maker" interchangeably. In any event, American State would not loan Schaefer and Parker any money as its president was unsure of their credit standing. Instead, it agreed to write a "renewal" note of Maxon's debt adding Schaefer and Parker as co-signers, but only if Maxon also signed the new note, because in the president's words:

> In my mind the loan—the original loan was to Mr. Maxon, and I agreed to let Mr. Schaefer and Mr. Parker sign that note, but I also stated that Mr. Maxon would have to sign the note because it was actually in the eyes of American State Bank that was his obligation.

When Maxon was told his signature would be required on the note, he requested another favor. A former banker and finance company loan officer himself, Maxon entreated, "I don't want them to know I'm on the note." American State acceded. The note showed only Schaefer's and Parker's names typed on its face and on the truth in lending statement. On January 4, 1988, Schaefer and Parker signed first and after they left, Maxon arrived and also signed. All signed in the lower right hand corner, the portion of the note reserved for co-makers' signatures. On the back of the note there was a specific

place for a guarantor to sign, which was not used. The apparent result was to renew Maxon's pre-existing debt in a new note with three co-makers. This "due on demand" note (Exhibit # 10) contained language allowing "any extensions and renewals hereof without notice to any maker, co-maker, endorser, surety or guarantor."

In May 1988, First Dakota purchased American State's assets including the note at issue here. When no payment had been made on the note, First Dakota sent Schaefer a letter dated July 22, 1988 stating the current balance with interest on "your Maxon loan assumption" and asked for payment. Five days later, First Dakota sent Maxon a letter stating in part: "The note is still due at this time, so you may want to make a contact with the other people involved." First Dakota sent no notice to Parker. Schaefer paid the interest due on August 17, 1988 and made another payment of interest on October 27, 1988. On that date, First Dakota prepared another renewal note (Exhibit # 18) in the same principal amount as Exhibit # 10, listing Schaefer and Parker as borrowers, with a new due date of October 27, 1989. Unlike Exhibit # 10 the new note provided for installment payments and a variable interest rate. On the lower right hand portion of the note, a signature line for Schaefer, Parker and Maxon was reserved for each, with their names typed underneath. Schaefer explained, however, that he had purchased Parker's stock in J & J and that Parker was no longer associated with the motel contract, so First Dakota crossed out Parker's typewritten name and Schaefer signed. First Dakota did not assign a new number to this renewal note, but carried over the number that had been assigned to the first note.

In January, 1989 when Maxon was in First Dakota on business, the president asked Maxon to also sign this note the same as he had with Exhibit # 10. Maxon refused. The president responded that Maxon would remain liable on the first renewal note. First Dakota had told Schaefer that the second renewal note would not be valid until Maxon also signed it, but it nonetheless continued collecting monthly installments from Schaefer.

On October 27, 1989 the second renewal note became due but was still not paid in full. So First Dakota extended the due date and Schaefer continued making payments until August 10, 1990. Two months later First Dakota sent past due notices on this note to both Schaefer and Maxon. The notices stated the amount past due as $2,000. When Schaefer defaulted on the note, it had a remaining balance of $36,571.72. J & J also defaulted on the sale contract, so Maxon repossessed the motel and lounge and later sold it to another buyer. Schaefer filed for bankruptcy. First Dakota brought suit on the first renewal note (Exhibit # 10) against Maxon and Parker. The trial court found that Maxon became an involuntary surety and his liability was discharged when Schaefer signed the second renewal note with different terms of payment and interest; Parker's liability was likewise discharged when First Dakota crossed his name out on Exhibit # 18. Judgment was entered against First Dakota and it now appeals.

### STANDARD OF REVIEW

A trial court's findings of fact are presumed correct and we will not seek reasons to reverse. *Matter of Estate of Perkins,* 508 N.W.2d 597, 600 (S.D.1993); *R & S Construction Co. v. BDL Enterprises,* 500 N.W.2d 628, 630 (S.D.1993); *Insurance Agents, Inc. v. Zimmerman,* 381 N.W.2d 218, 219 (S.D.1986). We cannot set aside factual findings unless we are convinced they are clearly erroneous; on the entire evidence this Court must be left with a definite and firm conviction that a mistake has been made. *In re A.R.P.,* 519 N.W.2d 56, 61 (S.D.1994); *In re Kindle,* 509 N.W.2d 278, 283 (S.D.1993); *Perkins,* 508 N.W.2d at 600. This Court will not disturb a finding of fact supported by evidence, even if we would have reached a different conclusion on that same evidence. *Bass v. Happy Rest, Inc.,* 507 N.W.2d 317, 324 (S.D.1993); *In re Estate of Hobelsberger,* 181 N.W.2d 455, 458–59 (S.D.1970). Findings of fact must support conclusions of law. *Kindle,* 509 N.W.2d at 283; *Centrol, Inc. v. Morrow,* 489 N.W.2d 890, 894 (S.D.1992);

*Knodel v. Board of County Comm'rs,* 269 N.W.2d 386, 390 (S.D.1978).

## ANALYSIS

**Which rules apply when determining accommodation status on a promissory note?**

In its Memorandum Opinion (incorporated in the findings) the trial court relied on *Varga v. Woods,* 381 N.W.2d 247, 250 (S.D.1986) (citing 72 C.J.S. *Principal and Surety* § 40 (1951)):

> A common instance of involuntary suretyship, at least as between the principal and surety themselves, occurs where one party to a contract, as a part of the agreement, assumes an indebtedness owing by the other to a third person, the one assuming the indebtedness becoming the principal, and the former debtor a surety....

Without making specific findings about the parties' intent and without resort to Uniform Commercial Code (UCC) standards for determining accommodation (surety) status, the trial court thereupon concluded

> Schaefer and Parker assumed Maxon's indebtedness to the Bank and the Bank accepted this by thereafter receiving payments and negotiating terms with Schaefer. In this case, the relationship of the parties was that of creditor, Bank; principal debtors, Schaefer and Parker; and surety, Maxon.

Upon labeling Maxon a surety, the court reasoned that by extending the time for payment on the note and changing its terms, First Dakota discharged him pursuant to SDCL 57A–3–606(1)(a). South Dakota adopted the UCC in 1966. As this case involves a promissory note—an instrument immured in the UCC—*Varga's* pre-UCC rationale is inapplicable here. SDCL 57A–1–103; SDCL 57A–3–104(1).[1]

■ Analyzing the facts under the UCC, we begin with SDCL 57A–3–606(1)(a), which provides in part:

> (1) The holder discharges any party to the instrument to the extent that without such party's consent the holder

> (a) Without express reservation of rights releases or agrees not to sue any person against whom the party has to the knowledge of the holder a right of recourse or agrees to suspend the right to enforce against such person the instrument or collateral or otherwise discharges such person....

A majority of courts have interpreted the term "any party to the instrument" as used in UCC § 3–606 as applying only to accommodation parties, whether appearing as makers or indorsers, and not to nonaccommodation makers. *See* Ronald A. Anderson, UNIFORM COMMERCIAL CODE § 3–606:20 (3d ed. rev. 1993); James A. White & Robert S. Summers, UNIFORM COMMERCIAL CODE § 13–16 (3d ed. 1988); and cases cited therein. Indeed, the UCC drafters intended to limit the defense of discharge under § 3–606 to those who sign an instrument as an accommodation party, a position which an ordinary, nonaccommodating, maker or co-maker does not occupy. *See* UCC § 3–606, comment 1 (1991). The question is, therefore, whether Maxon was truly an accommodation party at the time he signed the note (Exhibit # 10).

**Who is an Accommodation Party Under the UCC?**

■ "An accommodation party is one who signs the instrument in any capacity for the purpose of lending his name to another party to it." SDCL 57A–3–415(1) (1988). Accommodation status is a fact question. *Campo v. Maloney,* 122 N.H. 162, 442 A.2d 997 (1982); *see also* ANDERSON at § 3–415:17. A maker or co-maker who signs for accommodation purposes may be treated as a surety. *Wang v. Wang,* 393 N.W.2d 771 (S.D. 1985); WHITE & SUMMERS at § 13–16. The courts have considered the following factors in determining a note signer's status:

■ *1. Was there an intent to create accommodation status?* "Whether a person is an accommodation party is a question of intent." *Branch Banking & Trust Co. v. Thompson,* 107 N.C.App. 53, 418 S.E.2d 694 (1992) (citing ANDERSON at § 3–415:16). Fact finders "should focus on the intentions

---

1. In 1994, numerous sections of SDCL title 57A were amended. References herein correspond to the applicable law in 1993 when this case was before the circuit court.

of the parties as reflected by the language of the pertinent instrument and by the surrounding circumstances." *Campo,* 442 A.2d at 1001; Russell L. Wald, Annotation, *Who is Accommodation Party Under Uniform Commercial Code* § 3–415, 90 A.L.R.3d 342, 347 (1979). Parol evidence was admissible in this instance to show the parties' intent. SDCL 57A–3–415(3); *Wang,* 393 N.W.2d at 774. The trial court made no finding on intent, but concluded (per *Varga* ) that Maxon was a surety because Schaefer and Parker agreed to assume his debt by signing a new note. Then the court reasoned that Maxon transformed into an involuntary surety when the note was renewed with different terms. Not only did the court apply the wrong law, but its conclusion was clearly erroneous. The purpose for creating the first renewal note (Exhibit # 10) was to allow Maxon to sell his business by having his buyers pay his debt as part of their down payment to Maxon. The intent was certainly not to extend Maxon's buyers' credit on a note to which Maxon was merely lending his name. The bank specifically refused to grant a new loan to Schaefer and Parker.

    **2.** *What was the relative position of the signature on the note and words accompanying it?*

    The position of the surety's signature on the instrument and the words he adds to his signature are the strongest indicator of his status. A surety who accommodates another party by signing as an indorser will usually disclose his surety status merely by the relative position of his name on the instrument.

WHITE & SUMMERS at § 13–14. Maxon's signature appears in the area reserved for co-makers and although he signed last, as an accommodating co-maker might do, such placement only occurred because Maxon wanted to give the impression to his buyers that only they were signing the note. As the official comment to UCC 3–402 states, "a signature in the lower right hand corner of an instrument indicates an intent to sign as the maker of a note...." *See Rahall v. Tweel,* 411 S.E.2d 461 (W.Va.1991).

    Presumably, then, nearly every defendant who is an accommodation party reveals his status by indorsing out of the chain, or by using the words "payment guaranteed" or the like, or by the addition of the title "surety or accommodation party" after his name.

WHITE AND SUMMERS at § 13–14. The note contains no language indicating Maxon to be an accommodation party and he certainly did not sign "out of the chain." *See Factors & Note Buyers, Inc. v. Green Lane, Inc.,* 102 N.J.Super. 43, 245 A.2d 223 (1968); *cf.* SDCL 57A–3–402.

    **3.** *Was the signer part of the negotiations on the note?*

    An individual will ... be regarded as an accommodation party in the following instances:

    (1) the individual did not participate in either the initial negotiation or any subsequent modifications of the credit transactions;

    (2) the individual was not the one seeking credit;

    (3) the individual was not the one to whom the loan proceeds were credited and

    (4) the individual had no interest in the purpose for which the loan proceeds were used.

*Farm Credit Bank v. Whitlock,* 202 Ill. App.3d 609, 148 Ill.Dec. 158, 162, 560 N.E.2d 460, 464 (1990). Maxon's surety argument is utterly untenable under this factor. He initiated negotiations to get the bank to first loan money to his buyers and then when that failed, to obtain a renewal note with his buyers and himself as co-signers.

    **4.** *Was the signer a beneficiary in the transaction?* Although an accommodation party can receive a benefit under the code without impairing his status as a surety, evidence of some benefit may raise a permissible inference that a party is not an accommodation maker. This factor is not controlling, but may be considered with all the other circumstances in the case. *See* UCC § 3–415 comment 2; *see also LeRoy v. Marquette Nat. Bank,* 277 N.W.2d 351, 355 (Minn.1979). "The fact that an accommodation party does not receive any consideration merely confirms the conclusion that he is an accommodation party and does not affect the obli-

gation." ANDERSON at § 3–415:25. On the other hand, one who receives the primary benefit from the instrument is not an accommodation party. *Id.* at §§ 3–415:25, 3–415:32; *see also Lasky v. Berger*, 536 P.2d 1157 (Colo.App.1975) (receipt of benefits at time note is signed may be substantial evidence that party did not sign as accommodation maker but as co-maker). So, for example, a signer of a note is not an accommodation maker when the note discharges an earlier note on which the signer was personally liable and no consideration was given for the second note. *Mooney v. GR and Associates*, 746 P.2d 1174 (Utah App.1987). The trial court concluded (per *Varga*), "Even though the Bank was not a party to the Agreement for the sale of the motel and lounge, *it was made for the Bank's benefit* and the Bank is impliedly included as within the privity thereof...." (Emphasis added.) The record is barren of any support for such a finding. Maxon was a major beneficiary of these transactions, which allowed him to sell his motel by having his buyers assume his unrelated loan as part of the down payment.

■ *5. Did the signer receive the proceeds of the note?* Parties cannot be accommodation makers on notes given for their own debt. *Utah Farm Production Credit Ass'n v. Watts*, 737 P.2d 154 (Utah 1987); *Kopff v. Miller*, 501 S.W.2d 532, 537 (Mo. App.1973). Maxon received all the proceeds on the original loan; Exhibit # 10 was purely a renewal note on that loan.

> It is generally held that the mere execution of a renewal note evidences the same debt by a new promise and does not constitute a payment or discharge of the original note but operates only as an extension of time for payment. It is true that one note may be accepted in payment of another, but a new note given without any new consideration to the same person for the same sum as the old one is not generally deemed a satisfaction thereof, unless so received and accepted.

*Utah Farm Prod. Credit*, 737 P.2d at 159–60 (quoting *Farmers Union Oil Co. v. Flade-*

*land*, 287 Minn. 315, 178 N.W.2d 254, 257 (1970)).

■ *6. Was the party's signature necessary for the primary maker to get the loan?* "The accommodation status of a party is established by proof that the other maker was unable to obtain a loan from the bank because of his poor credit standing until the alleged accommodation party co-signed the note...." ANDERSON at § 3–415:21. Maxon's signature was not given so that Schaefer and Parker could obtain a new money loan. On the contrary, Maxon's signature was on the new note, because it was merely a renewal of his previous note, with two more names added. The Bank wanted Maxon to remain fully liable on his loan. Putting Schaefer's and Parker's names on the note was for Maxon's benefit, so he could close his sale. Maxon did not "lend his name" to the transaction; the transaction was his. SDCL 57A–3–415.

Applying the above factors, Maxon plainly fails to qualify as an accommodation party, so he could not avail himself of the suretyship defenses under SDCL 57A–3–606 and could not have become an involuntary surety when Exhibit # 18 was signed or extended.[2]

### Were Parker and Maxon discharged as ordinary co-makers?

■ The UCC provides multiple avenues for discharging co-maker liability on an instrument. SDCL 57A–3–601 *et seq.* Both Parker and Maxon contend that the bank's acceptance from Schaefer of Exhibit # 18 discharged their liability on the earlier note. With specific respect to Parker, the question is did First Dakota's striking of Parker's name on Exhibit # 18, which he never signed, discharge him from liability on the note he did sign, Exhibit # 10? "It is a question of intention whether the taking of [a renewal note satisfies] the earlier obligation, a question to be determined by all the facts and circumstances (what was the state of the bank's knowledge, what did the bank do with the old notes, etc.)." WHITE AND SUMMERS at § 13–22. We note that First Dakota never

2. Parker argues in his appellate brief that he too was a surety. We deem this argument to be   without merit.

relinquished Exhibit # 10 nor renounced its rights under that instrument. No one's name was stricken in that note. Ordinarily, taking one instrument for another will not discharge liability on the other instrument, but merely suspends it. SDCL 57A–3–802; WHITE AND SUMMERS, § 13–22.

> When it is claimed that there has been a discharge of a party without consideration the evidence must establish (1) an intent that the party be discharged from liability, and (2) a cancellation on the face of the paper or a separate writing evidencing a discharge, or a surrender of the paper in conformity with UCC § 3–605.

ANDERSON at § 3–605:5; see American Fidelity Bank & Trust Co. v. Hinkle, 747 S.W.2d 620, 623 (Ky.App.1988). No discharge occurred in compliance with SDCL 57A–3–605 (1988), which provides in part:

> (1) The holder of an instrument may even without consideration discharge any party
>
> (a) In any manner apparent on the face of the instrument or the endorsement, as by intentionally canceling the instrument or the party's signature by destruction or mutilation, or by striking out the party's signature; or
>
> (b) By renouncing his rights by a writing signed and delivered or by surrender of the instrument to the party to be discharged.

Furthermore, Maxon and Parker consented in advance and in writing to an extension as evidenced by the specific language in Exhibit # 10, agreeing to "any extensions and renewals hereof without notice...." "A consent contained in the paper is binding upon the parties signing it and bars their claiming a discharge that comes within the scope of the consent." ANDERSON at § 3–606:24. Even against sureties, consents in advance do not offend the UCC. See UCC § 3–606, comment 2 ("Consent may be given in advance, and is commonly incorporated in the instrument; or it may be given afterward. It requires no consideration, and operates as a waiver of the consenting party's right to claim his own discharge"). As they agreed to "any extension" such language encom-

passed more than one renewal or extension. Cf. SDCL 57A–3–118(f).

Maxon and Parker were obviously not bound by the different terms in Exhibit # 18, but the mere fact that Schaefer solely executed a renewal note would not relieve the other co-makers on the prior note. Indeed, on the day Maxon refused to sign Exhibit # 18 First Dakota's President informed Maxon that he considered Exhibit # 10 to be still in force nonetheless. Striking Parker's name on Exhibit # 18 signified only that the bank did not intend to have him sign a renewal note while Schaefer was continuing to pay on the debt. By keeping custody of Exhibit # 10, First Dakota demonstrated its continued intent to hold the co-makers liable. Any other conclusion defies logic, especially with respect to Maxon: How could it be that by refusing to sign another renewal note, Maxon relieved himself of any obligation on the note he did sign? To infer that a creditor would so release a solvent co-maker without consideration, the very co-maker who received all the original loan proceeds, ignores standard banking practice. In the United States it is common for banks to extend payment on original notes with renewal notes. See Commerce Union Bank v. Burger–In–A–Pouch, 657 S.W.2d 88 (Tenn.1983); Estate of Williams, 109 Ill.App.3d 828, 65 Ill.Dec. 499, 441 N.E.2d 412 (1982).

Maxon next argues that he was discharged pursuant to SDCL 56–1–22 (exoneration of guarantor by alteration of original obligation). He claims he became a guarantor because he signed Exhibit # 10 at a later time than when Schaefer and Parker signed it. Richter v. Industrial Finance Co., Inc., 88 S.D. 466, 221 N.W.2d 31 (1974). First, the trial court never found Maxon to be a guarantor. Second, his argument ignores the circumstances discussed earlier in which at his request he came in last to sign Exhibit # 10. Third, there was no notation on Exhibit # 10 or elsewhere as required by SDCL 57A–3–416(a)(1) to evidence his claimed guarantor's status. Brown County Coop. v. Rasmussen–King Cattle Co., 300 N.W.2d 265 (S.D.1980). In fact, Maxon did not sign on the back of the note at the place reserved for guarantors. See In re Baker & Getty Finan-

*cial Services, Inc.,* 974 F.2d 712, 717 (6th Cir.1992). Maxon was not a guarantor.

Lastly, Parker contends he was discharged by a novation. Novation is an affirmative defense; it was Parker's burden to prove such defense. *Ducheneaux v. Miller,* 488 N.W.2d 902 (S.D.1992); *Haggar v. Olfert,* 387 N.W.2d 45, 49 (S.D.1986). Parker never pleaded this defense and the trial court made no findings thereon. We therefore decline to consider this argument.

Reversed.

MILLER, C.J., and SABERS, J., concur.

AMUNDSON, J., and WUEST, Retired J., dissent.

GILBERTSON, J., not having been a member of the Court at the time this case was considered, did not participate.

WUEST, Retired Justice (dissenting).

I dissent. We give lip service to the legal principle, "we do not reverse the circuit court on factual questions unless it is clearly erroneous." In my opinion, the majority decision does exactly that. This court must not disturb findings by the circuit court, which are supported by the evidence, even if we would have reached a different conclusion on the same evidence. *Bass v. Happy Rest, Inc.,* 507 N.W.2d 317, 324 (S.D.1993). The circuit court found Maxon was a surety and the Bank's own acts discharged Maxon from liability on the note when it changed the terms of payment and rate of interest. While Maxon agreed to "any extensions and renewals" when he signed the original note, he did not consent to an increased rate of interest or altered payment terms. Maxon did not sign the new note nor did he otherwise assent to be bound. I would affirm the circuit court's decision.

The majority cites trial testimony indicating the Bank's president, who wrote the new note, believed the note to be Maxon's obligation. However, Maxon testified the Bank president told him " 'I will not loan [Schaefer and Parker] the money unless you guarantee it.' " This statement by the Bank president, along with other evidence discussed herein, justified the circuit court in finding Maxon was a guarantor, rather than a primary obligor on the debt. Maxon further testified his understanding was that his original obligation was paid off with the money loaned to Schaefer and Parker from this note. As Schaefer's co-maker on the note, Parker testified his understanding when he signed the note was "[t]hat it was a one-time payment and ... that it relieved Mr. Maxon of his obligation, and that was part of our [$]75,000 that we owed Mr. Maxon." Schaefer testified it was never his intention that Maxon have any liability on this debt. The circuit court found the Bank omitted Maxon's name from both the promissory note and the Truth-in-Lending Disclosure Statement when it executed the new note. Also significant is that although the Bank exercised its set-off rights against other accounts of Schaefer's to repay the note, it never exercised these same rights against accounts held by Maxon with the Bank.

Whether a person is an accommodation party is a question of fact, and the circuit court makes this determination by focusing on " 'the intention of the parties as reflected by the language of the pertinent instrument and by the surrounding circumstances.' " *Huron County Banking Co., N.A. v. Knallay,* 22 Ohio App.3d 110, 489 N.E.2d 1049, 1054 (1984) (quoting *Campo v. Maloney,* 122 N.H. 162, 442 A.2d 997, 1001 (1982)). *See also In re Baker & Getty Financial Serv., Inc.,* 974 F.2d 712, 716 (6th Cir.1992); *Godfrey State Bank v. Mundy,* 90 Ill.App.3d 142, 45 Ill.Dec. 549, 552, 412 N.E.2d 1131, 1134 (1980) (simply because a party signs a note as a maker does not preclude that party from being an accommodation party to that note). "Whether a person is an accommodation party is a question of intent." *Branch Banking & Trust Co. v. Thompson,* 107 N.C.App. 53, 418 S.E.2d 694, 698 (1992). The parties' intention is the significant element in determining whether a party is an accommodation party within the meaning of § 3–415(1).[1] *Holcomb State Bank v. Adamson,* 107 Ill.

---

1. UCC § 3–415(1) is identical to SDCL 57A–3–415(1) which provides "[a]n accommodation party is one who signs the instrument in any capacity for the purpose of lending his name to another party to it."

App.3d 908, 63 Ill.Dec. 704, 707, 438 N.E.2d 635, 638 (1982). *See also Mobley v. Harmon,* 304 Ark. 500, 803 S.W.2d 900, 901 (1991); *Farmers State Bank of Oakley v. Cooper,* 227 Kan. 547, 608 P.2d 929, 934 (1980); *Peoples Bank of Point Pleasant v. Pied Piper Retreat, Inc.,* 158 W.Va. 170, 209 S.E.2d 573, 578 (App.1974). The intention of the parties is a factual question to be resolved by the trier of fact. *Catania v. Catania,* 26 Conn. App. 359, 601 A.2d 543, 546 (1992); *Airstream, Inc. v. CIT Financial Serv., Inc.,* 111 Idaho 307, 723 P.2d 851, 857 (1986). I am convinced, after reviewing the record in this case, the circuit court could infer from the circumstances, conversations, and conduct of the parties that Maxon signed the note as an accommodation party.[2]

The original note, written January 4, 1988, was due July 4, 1988 and called for a single lump sum payment on that date. Interest accruing on the loan was to be paid every six months at the fixed rate of 12%. Schaefer made two interest payments but did not pay the debt in full by its due date. In October 1988, the Bank extended the period of payment and changed the rate of interest from the fixed rate of 12% to a variable rate starting at 12.5%, with rates not to exceed 15.5% or go below 9.5%. Principal and interest payments were now due on a monthly installment basis, the amount of the monthly payments to increase as the loan neared maturity in October 1989. When this extended due date passed without the loan being paid in full, the Bank granted a second extension of the note. Schaefer's was the only signature on these extended notes.

In *Varga v. Woods,* 381 N.W.2d 247 (S.D. 1986), we noted "[i]t has long been recognized by this Court 'that a binding agreement between the creditor and the principal debtor, whereby the creditor extends the time for payment or performance, or agrees for a definite period to forbear or postpone the enforcement of his remedy, entirely discharges the surety, whether he is harmed thereby or not.'" *Varga,* 381 N.W.2d at 252 (quoting *Zastrow v. Knight,* 56 S.D. 554, 560,

229 N.W. 925, 928, 72 A.L.R. 379, 383 (1930)) (also citing *Citizens State Bank v. Rosenwald,* 63 S.D. 50, 256 N.W. 264 (1934)). SDCL 57A–3–606, which is identical to UCC § 3–606 and which was also discussed in *Varga,* further provides the surety will not be discharged where he has previously assented to be bound.

The circuit court's finding that Maxon signed the original note as an accommodation party made defenses of the law of suretyship available to Maxon. The law of suretyship is codified in SDCL Chapter 56. SDCL 56–2–10 provides "[a] surety is exonerated to the extent to which he is prejudiced by any act of the creditor which would naturally prove injurious to the remedies of the surety or inconsistent with his rights or which lessens his security." SDCL 56–2–8 states "[a] surety is exonerated in like manner with the guarantor" and SDCL 56–1–22 provides "[a] guarantor is exonerated except so far as he may be indemnified by the principal *if by any act of the creditor, without the consent of the guarantor, the original obligation of the principal is altered in any respect* or the remedies or rights of the creditor against the principal in respect thereto in any way impaired or suspended." (Emphasis added).

Other jurisdictions having addressed this issue have held that "[t]he obligation underlying a surety agreement cannot be modified without the surety's assent. A modification which alters the surety's obligation will discharge the surety. However, the alteration must be a material change." *First Nat'l Bank of Anthony v. Dunning,* 18 Kan.App.2d 518, 855 P.2d 493, 495 (1993). Courts have also noted "the law of suretyship provides that a surety is entitled to stand on the strict letter of the contract upon which he is liable, and where he does not consent to a variation and a variation is made, it is fatal." *First Fed. S & L Ass'n of Gary v. Arena,* 406 N.E.2d 1279, 1284 (Ind.Ct.App.1980).

The *First Nat'l Bank of Anthony* court found an increase in the variable interest

---

**2.** The circuit court found the relationship between the parties was that of creditor (Bank), principal debtors (Schaefer and Parker), and surety (Maxon). Although the majority asserts

the circuit court never found Maxon to be a guarantor, SDCL 57A–1–201(40) provides that "'[s]urety'" includes guarantor."

rate from 11.25% to 12.25% not to be a material modification of the surety agreement where the change in interest rates had been anticipated in the parties' contract. *First Bank of Anthony*, 855 P.2d at 496. Similarly, a Georgia appellate court held a party who consented in advance to provisions allowing the bank to "extend or renew for any period ..., *alter or exchange any of the liabilities*" could not claim the renewal of the original note on different terms of interest operated to discharge him as a surety. *Citizens & Southern Nat'l Bank v. Richardson*, 190 Ga.App. 36, 378 S.E.2d 159, 160–61 (1989) (emphasis added).

In contrast, however, in an action brought by a bank against a co-maker[3] of his son's promissory note where an interest rate of 8.30% for the original note had been increased to 9% on the third renewal, the court held the surety's obligation was discharged because "[w]hile the language of the ... provisions in the note would include modification, it cannot be construed as being a general consent to all modifications. There is no mention of a change in interest rate.... [I]t is the unconsented change in potential risk or liability not the imposition of greater liability that causes the discharge." *Bank of Terrell v. Webb*, 177 Ga.App. 715, 341 S.E.2d 258, 59–60 (1986). The *Bank of Terrell* court further noted "[b]esides those specifically enumerated, the UCC provisions for discharge of a party from liability on an instrument to another party includes 'any other act or agreement with such party which would discharge his simple contract for the payment of money.'" *Id.* 341 S.E.2d at 258 (quoting Georgia's version of UCC § 3–601(2) which is identical to SDCL 57A–3–601(2)). *See also In re Murchison*, 102 B.R. 545 (Bankr. N.D.Tex.1988) (applying Nevada common law and also considering Nevada's version of UCC § 3–606, the surety was discharged when the underlying obligation was materially altered during a bankruptcy restructuring thereby significantly increasing risks without the surety's consent or knowledge).

In *Cooper Investments v. Conger*, 775 P.2d 76 (Colo.Ct.App.1989), the court held that if some co-guarantors consented to material alteration of the promissory note, their obligation was not affected, but non-consenting guarantors were discharged by operation of the law. *Id.* at 80. The court noted when a creditor chooses to alter materially the principal debtor's obligation to the guarantor's detriment without the guarantor's consent, that alteration discharges the guarantor's liability on the note. *Id.* at 78. "An alteration is material if it changes the nature of the principal debtor's obligation, 'either by imposing some new obligation ... or by taking away some obligation already imposed.'" *Id.* (quoting Stearns, Law of Suretyship § 6.3 (1951)). The *Cooper* court noted the rate of interest a principal debtor is required to pay on a promissory note *is a material term of that note. Id.* (citing *Citizens Bank v. Lair*, 687 S.W.2d 268 (Mo.Ct.App.1985) and *First Nat'l Bank v. Abraham*, 97 N.M. 288, 639 P.2d 575 (N.M.1982)). The court further noted "'[t]he liability of the guarantor is not to be extended by implication beyond the express limits or terms of the instrument, or its plain intent. It has been said a guarantor, is, like a surety, a favorite of the law.'" *Id.* at 79 (quoting *Burkhardt v. Bank of America*, 127 Colo. 251, 256 P.2d 234 (1954). *See also* Peters, *Suretyship under Article 3 of the Uniform Commercial Code*, 77 Yale L.J. 833, 861–62 (1968) ("The surety's undertaking, his basic commitment to creditor and principal, represents the high water mark of the surety's potential liability. Other promisors may find their contractual commitments elastically construed, but the surety's contract is *strictissimi juris;* as a favorite of the law, he can safely assume that implied conditions may limit but not extend the scope of his undertaking.")

In 1988, we held that "once the validity of a guaranty is recognized, the terms of the instrument itself determine whether alterations to the obligations of the principal are sufficient to exonerate the duty of the guarantor." *Sunbank of S.D. v. Precision Specialty Products, Inc.*, 429 N.W.2d 73, 75 (S.D.

---

**3.** The defendant in this action was able to show by parol evidence that he was an accommodation party thereby establishing his rights as a surety.

*Bank of Terrell v. Webb,* 177 Ga.App. 715, 341 S.E.2d 258, 258 (1986).

1988) (citing *First Nat'l Bank of Beresford v. Nelson*, 323 N.W.2d 879 (S.D.1982); *U.S. v. Porter*, 581 F.2d 698 (8th Cir.1978)). In other words, the terms of the instrument control whether a surety has given his consent to the increased risk or liability. The terms of the note in this case do not evidence such consent by Maxon.[4] The circuit court was not clearly erroneous in finding Maxon did not consent to the increased interest rate, and thus the potential increased risk of liability. Maxon was therefore discharged from any obligation on the note Schaefer signed with First Dakota National Bank.

The new note also listed Parker's name as one of the borrowers. However, Schaefer informed the Bank that Parker was no longer involved in the business and had sold his stock in J & J Hotels, Inc. to Schaefer. Parker did not sign this new note. The circuit court found the Bank then crossed through Parker's typewritten name on the document, thus discharging Parker from any liability on the note. I would affirm this finding by the circuit court and find its support in law under SDCL 57A–3–606(1)(a). This statute provides, in pertinent part:

(1) The holder discharges any party to the instrument to the extent that without such party's consent the holder

(a) Without express reservation of rights releases or agrees not to sue any person against whom the party has to the knowledge of the holder a right of recourse or agrees to suspend the right to enforce against such person the instrument or collateral or otherwise discharges such person. . . .

Under SDCL 57A–3–606(1)(a), the Bank discharged Parker and agreed to hold Schaefer solely liable as principal debtor for the note when it, after learning Parker was no longer associated with J & J, crossed Parker's name off as borrower. Though there was disputed testimony at trial regarding exactly how and by whom Parker's name was crossed off this document, the circuit court found against the Bank on this question. Due regard will be given to the trial court to

judge credibility of witnesses. SDCL 15–6–52(a). *Arnold Murray Constr. v. Wittrock*, 487 N.W.2d 33, 35 (S.D.1992); *State By and Through DOT v. Garvin*, 456 N.W.2d 779, 781 (S.D.1990).

There is evidence in the record to support the circuit court's findings and these findings support its conclusions of law. I dissent from the majority opinion and would affirm the circuit court's decision.

I am hereby authorized to state that Justice AMUNDSON joins this dissent.

---

4. Under the terms of the original note, Maxon consented to "any extensions or renewals," however, nothing in the terms of the note evidenced consent by Maxon to be bound to a changed rate of interest or altered terms of payment. The note was silent in this regard.